**ALDENS, INC., Plaintiff,**

v.

**Israel PACKEL, Attorney General of the Commonwealth of Pennsylvania, Individually and in his official capacity, Defendant.**

**Civ. No. 73–674.**

United States District Court,
M. D. Pennsylvania.

Aug. 2, 1974.

Ralph S. Snyder, Gerard J. St. John, David S. Petkun, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for plaintiff.

Lawrence R. Richard, Asst. Atty. Gen., Div. of Consumer Affairs, Harrisburg, Pa., for defendant.

## OPINION

MUIR, District Judge.

Plaintiff Aldens, Inc. (Aldens), an Illinois corporation engaged in the business of interstate mail order sales to purchasers who are located in all states of the Union, filed this action seeking a declaratory judgment that application of the Pennsylvania Goods and Services Installment Sales Act, 69 P.S. § 1101 et seq. (the Act), to Aldens' transactions with Pennsylvania residents is unconstitutional. Defendant, Attorney General for the Commonwealth of Pennsylvania, threatens to enforce the Act against Plaintiff. The Act provides, *inter alia*, for the form and content of retail installment contracts and monthly billing statements and prohibits finance charges for revolving charge accounts in excess of an annual rate of 15%.[1] Al-

---

1. Pertinent sections of the Act provide as follows:

69 P.S. § 1103.

"Contracts within Act.

For the purposes of this act a retail installment contract, contract, retail install-

dens utilizes a standard credit agreement for all transactions involving customers throughout the United States. This credit agreement does not comply with the form and content requirements of the Act, and provides for a monthly finance charge of 1.75% on balances of $350.00 or less (annual percentage rate of 21%). Because Plaintiff deals from Illinois with its Pennsylvania customers solely through the use of the United States mails and common carriers, it contends that application of the Act to the transactions with Pennsylvania resi-

ment account, installment account, or revolving account is made in Pennsylvania and, therefore, subject to the provisions of this act if either the seller offers or agrees in Pennsylvania to sell to a resident buyer of Pennsylvania or if such resident Pennsylvania buyer accepts or makes the offer in Pennsylvania to buy, regardless of the situs of the contract as specified therein.

Any solicitation or communication to sell, verbal or written, originating outside the Commonwealth of Pennsylvania but forwarded to and received in Pennsylvania by a resident buyer of Pennsylvania shall be construed as an offer or agreement to sell in Pennsylvania.

Any solicitation or communication to buy, verbal or written, originating within the Commonwealth of Pennsylvania from a resident buyer of Pennsylvania, but forwarded to and received by a retail seller outside the Commonwealth of Pennsylvania shall be construed as an acceptance or offer to buy in Pennsylvania."

69 P.S. § 1901.

"Establishment of account.

A retail installment account may be established by the seller upon the request of a buyer or prospective buyer. A statement setting forth the rates of service charge, which shall not exceed those authorized by section 904, and describing the balance on which such service charge will be computed, shall be printed in type no smaller than eight point in every application form used by the seller and shall be stated to the applicant when such installment accounts are negotiated by telephone.

Subject to the other provisions of this article, a retail installment account may be established by a financing agency on behalf of one or more sellers from whom the financing agency may, with the buyer's consent purchase or acquire indebtedness of the buyer to be paid in accordance with the agreement."

69 P.S. § 1904.

"Rates of service charge on accounts.

Subject to the other provisions of this article the seller or holder of a retail installment account may charge, receive and collect the service charge authorized by this act. The service charge shall not exceed the following rates computed on the outstanding balances from month to month:

(a) On the outstanding balance, one and one-quarter percent (1¼%) per month.

(b) A minimum service charge of seventy cents (70¢) per month may be made for each month if the service charge so computed is less than that amount; such minimum service charge may be imposed for a minimum period of six months.

(c) The service charge may be computed on a schedule of fixed amounts if as so computed it is applied to all amounts of outstanding balances equal to the fixed amount minus a differential of not more than five dollars ($5), provided that it is also applied to all amounts of outstanding balances equal to the fixed amount plus at least the same differential."

69 P.S. § 1905.

"Monthly statement.

The seller or holder of a retail installment account shall promptly provide the buyer with a statement as of the end of each monthly period (which need not be a calendar month) setting forth the following:

(a) The balance due to the seller or holder from the buyer at the beginning of the monthly period.

(b) The dollar amount of each purchase by the buyer during the monthly period and, (unless a sales slip or memorandum of each purchase has previously been furnished the buyer or is attached to the statement) the purchase or posting date, a brief description and the cash price of each purchase.

(c) The payments made by the buyer to the seller or holder and any other credits to the buyer during the monthly period.

(d) The amount of the service charge, and the following statement: The service charge herein contained does not exceed the equivalent of fifteen percent (15%) simple interest per annum on the unpaid balance except that a minimum service charge of seventy cents (70¢) per month may be made.

(e) The total balance in the account at the end of the monthly period.

(f) A legend to the effect that the buyer may at any time pay his total balance.

The items need not be stated in the sequence or order set forth above; additional items may be included to explain the computations made in determining the amount to be paid by the buyer."

dents is prohibited by the commerce clause, the due process clause of the 14th Amendment, and the postal clause of the United States Constitution.

Defendant Packel answered the complaint denying the unconstitutionality of the Act as applied to Aldens, and asserted a counterclaim in which he seeks declaratory judgment that the Act is constitutional as applied to Aldens and requests an injunction against Aldens' future non-compliance with the Act. Before the Court are cross-motions for summary judgment and Plaintiff's motion for judgment on the pleadings as to Defendant's counterclaim. The parties have entered into a stipulation of facts which contains all facts necessary for the determination of the issues in this proceeding and the Court has ruled on Defendant's objections that certain of the stipulated facts are irrelevant in this case. The following constitutes the factual record in this case:

1. Aldens, Inc. (Aldens), is an Illinois corporation with its only physical location in Chicago, Illinois. The business was established in Chicago in 1902 and has been conducted as a general retail merchandise mail order business in Chicago ever since.

2. Aldens sells merchandise to customers who reside in all fifty states.

3. The credit agreement in use nationally by Aldens provides that it is an Illinois contract governed by Illinois law. The credit agreement provides for a monthly finance charge of 1.75 percent on balances of $350.00 or less (annual percentage rate of 21 percent) which exceeds the rate permitted by § 904 of the Act, 69 P.S. § 1904, and a monthly finance charge of 1 percent on that portion of the account balance in excess of $350.00 (annual percentage rate of 12 percent). The annual rates are expressed in conformity with Section 226.-7(b)(5) of Regulation Z, promulgated by the Federal Reserve Board under the Federal Truth-in-Lending Act. The credit agreement complies with Illinois law and with the Federal Truth-in-Lending Act.

4. Aldens retains title only in the nature of a purchase money security interest in merchandise sold pursuant to the credit agreement with its customers. Aldens does not file any security interest documents, does not enforce any security interest, and has a security interest in merchandise unpaid for only to the extent provided by law.

5. Approximately 7.6 percent of Aldens' annual sales are made to Pennsylvania customers. Sales to Pennsylvania customers amount to approximately $14,900,000 per year. Approximately 27 percent of this amount is derived from cash sales and 73 percent from credit sales. Aldens has approximately 90,000 Pennsylvania credit customers; the average credit account balance is approximately $169.00.

6. Were Aldens to comply with the Pennsylvania Goods and Services Installment Act, it would incur additional annual costs and expenses, and would sustain revenue losses directly attributable to the burden imposed by that Act in excess of the following:

a. Approximate additional cost of preparing catalogs, advertising materials, and credit agreements containing Pennsylvania credit terms; special computer processing and handling costs for Pennsylvania customers in setting up accounts and producing monthly ing statements.  $ 53,000

b. Approximate loss of finance and service charge revenue from Pennsylvania customers  750,000

Total  $803,000

7. Were Aldens to comply with the provisions of the varying statutes in those states which presently regulate revolving charge agreements, Aldens would incur additional costs and expenses, aside from the effect of revenue losses due to the reductions in service and finance charges, in an amount in excess of $320,000, annually.

8. Aldens does not have in Pennsylvania any office, distribution house, sales house, warehouse or any other place of business.

9. Aldens does not have in Pennsylvania any agent, salesman, canvasser, solicitor or any other type of representative to sell or take orders, to deliver merchandise, to accept payments or to service merchandise it sells.

10. Subject to the security interest described in paragraph 4 hereof, Aldens does not own any tangible property, real or personal, in Pennsylvania.

11. Aldens has no telephone listing in Pennsylvania.

12. Pennsylvania customers are solicited solely by mail from outside Pennsylvania. They order primarily by mail, or occasionally by telephone, to Chicago, Illinois.

13. Aldens does not advertise its merchandise for sale in Pennsylvania newspapers, on billboards in Pennsylvania, or by placing advertisements with Pennsylvania redio or television stations.

14. Aldens is not required to collect and remit the Pennsylvania Use Tax.

15. Aldens mails catalogs to certain Pennsylvania residents about 4 times per year and in addition, mails to them "flyers," which are supplemental advertisements of merchandise, approximately 6 to 8 times per year. Aldens includes advertising material with the customer's monthly billing statement. The catalogs and "flyers" are mailed to persons on Aldens' active Pennsylvania customer list, comprising about 149,000 names. In addition, Aldens rents mailing lists from mailing list brokers (not Pennsylvania firms). Catalogs and "flyers" will be mailed in the year of 1974 to about 2,100,000 Pennsylvania residents on those lists. There may be some duplication between the mailings to names on the rented lists and the mailings to those on Aldens' customer lists. All Aldens' mailings are to named individuals and none are to "resident" or "occupant."

16. Aldens' procedures used in determining credit-worthiness involve the weighing of answers to the items of information called for in the Charge Application. In addition, about 22 percent of the applications are checked against a national credit index service located in New Jersey, and about 23 percent are checked by arrangement with a Chicago, Illinois credit reporting agency, by phoning credit bureaus in Pennsylvania for in-file checks of their records.

17. Application forms for credit accounts with Aldens and credit agreement forms are among the materials mailed by Aldens from its office in Chicago, Illinois to persons within the Commonwealth of Pennsylvania; credit application forms are completed and credit agreements are signed by Pennsylvania residents and are mailed from Pennsylvania to Aldens at its offices in Chicago.

18. Credit is granted only in Chicago and orders are accepted only in Chicago.

19. Merchandise sold to Pennsylvania customers is delivered to these customers by mail or by common carrier, all of the shipments originating outside of Pennsylvania. Merchandise is sent of an f. o. b. point of origin basis and the customer pays the shipping, handling and transportation costs.

20. Aldens is not required to qualify or register to do business in Pennsylvania.

21. Monthly statements are mailed in Chicago by Aldens to Pennsylvania credit customers following the receipt and acceptance of customers' orders. These statements set forth the charges to the customers' accounts and require payment thereof by stated dates to avoid assessments of finance charges.

22. Monthly payments by Pennsylvania customers for merchandise purchased and finance charges assessed under Aldens' credit plan are mailed from Pennsylvania to Aldens in Chicago, and, when received in Chicago, are credited to customers' accounts.

23. In the event that a Pennsylvania customer becomes delinquent in the pay-

ment of his or her account, Aldens attempts to collect the account by mailing letters and other communications from Chicago to the customer in Pennsylvania and, when appropriate, by telephoning the Pennsylvania customer, from Chicago, to discuss the account and request payment.

24. After an account has been delinquent for 6 months, Aldens writes it off as a bad debt. Aldens turns over approximately one half of the Pennsylvania accounts which have been written off (about 2.5 percent of its Pennsylvania receivables) to independent collection agencies located outside of Pennsylvania.

## DISCUSSION.

### I. Commerce Clause.

■ Plaintiff's chief ground in support of its contention that the Pennsylvania Goods and Services Installment Sales Act is unconstitutional is based upon the commerce clause. Traditional analysis of the commerce clause cases holds that a state statute affecting interstate commerce is constitutional providing that the following criteria are satisfied:

1. That it does not conflict with a federal statute or regulation. McDermott v. Wisconsin, 228 U.S. 115, 33 S.Ct. 431, 57 L.Ed. 754 (1913).

2. That it is not inconsistent with a federal policy. Chicago v. Atchison, T. & S.F.R. Co., 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958).

3. That the field has not been occupied by federal authority. Napier v. Atlantic Coast Line R. Co., 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432 (1926).

4. That the subject of the statute is not a national problem. Edwards v. California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941).

5. That it does not discriminate against interstate commerce. Dean Milk Co. v. Madison, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951).

6. That it does not constitute an undue burden upon interstate commerce.

Bibb v. Navajo Freight Lines, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959).

While Aldens asserts that the Act is an undue burden upon interstate commerce, it apparently does not contend that the Act fails to fulfill requirements (1) through (4) listed above. But Aldens urges that the Court need never reach the burden determination since the application of the Act to Aldens' transactions with Pennsylvania residents, which are exclusively interstate in character and do not involve any local activity, indicates that the state is attempting to regulate purely interstate transactions. This, Aldens asserts, is a "direct burden" upon interstate commerce, and not an "indirect burden," such as to require an undue burden analysis by the Court. I would have thought that the "direct burden" label was dead, DiSanto v. Pennsylvania, 273 U.S. 34, 44, 47 S.Ct. 267, 71 L.Ed. 524 (1927) (Stone, J., dissenting), and that the present test was whether the state interest involved is outweighed by the national interest in the unhampered operation of interstate commerce. South Carolina State Highway Department v. Barnwell Brothers, 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734 (1938). This latter test is applied by means of the traditional analysis noted above.

However, the novelty of the factual situation in this case requires that the Court consider Plaintiff's "direct burden" argument. Aldens has no physical presence in Pennsylvania. The agreements between Aldens and its Pennsylvania customers which the Act seeks to regulate are accepted in Illinois by Aldens. Aldens' argument that we must make a threshold determination as to whether Pennsylvania may regulate the contracts between Aldens and Pennsylvania residents, where the only local activity on the part of Aldens is through the United States mails and common carrier, has some appeal since there appears to be no reported case upholding state regulation of interstate commerce where the local activities of the business concerned are as scanty as they are here.

Aldens places its chief reliance upon the case of National Bellas Hess v. Department of Revenue of Illinois, 386 U. S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967). That case involved a Missouri mail order house, National Bellas Hess (National), which conducted its business entirely through the mails and by common carrier to its customers throughout the nation, including those in Illinois. National had no physical presence in Illinois, but advertised through catalogs and flyers to its Illinois customers. Its sales to Illinois residents amounted to about $2,000,000 for the 15-month period in dispute. In fact, the dealings between National and its Illinois customers, except as to the extent of solicitation and the dollar amount of the sales, are remarkably similar to the dealings between Aldens and its Pennsylvania customers. The Illinois courts entered a money judgment against National for refusal in violation of an Illinois statute to collect from its customers the 3½% tax imposed on goods sold for use within the state. The Supreme Court reversed the decision of the Illinois court and held that the Illinois statute violated both the Commerce Clause and the Due Process Clause of the 14th Amendment. The Court noted that the due process and commerce clause claims were closely related. Then, using due process analysis, the Court found that the paucity of contacts between National and Illinois negated the presence of a "minimum benefit" upon National from Illinois upon which the requirement to collect the use tax must be based. The Court observed that requiring a mail order business to collect use taxes would expose that business to similar burdens imposed by thousands of political subdivisions throughout the nation.

*National Bellas Hess*, because it concerns state taxation of interstate business, is not controlling upon the issues in the case *sub judice*.[2] Taxation is regarded as an exaction by the state for the general benefits of living under an organized government, and when falling upon interstate commerce, "can only be justified as designed to make such commerce bear a fair share of the cost of the local government whose protection it enjoys." National Bellas Hess v. Department of Revenue, *supra*, at p. 756, of 386 U.S., at p. 1391 of 87 S.Ct., quoting Freeman v. Hewit, 329 U.S. 249, 253, 67 S.Ct. 274, 91 L.Ed. 265 (1946). Thus, the question becomes whether the state has given anything for which it can ask a return. Wisconsin v. J. C. Penney Co., 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267 (1940). The Supreme Court in *National Bellas Hess* answered that question in the negative.

Plaintiff also relies on that line of cases which holds that state statutes requiring licensing of entities doing interstate business within the state are unconstitutional unless the activities performed within the state are unrelated to the interstate aspect of the business. Crutcher v. Kentucky, 141 U.S. 47, 11 S.Ct. 851, 35 L.Ed. 649 (1891); International Textbook Co. v. Pigg, 217 U.S. 91, 30 S.Ct. 481, 54 L.Ed. 678 (1910); Eli Lilly & Co., v. Sav-On-Drugs, Inc., 366 U.S. 276, 81 S.Ct. 1316, 6 L.Ed.2d 288 (1961). However, the state licensing statutes must also be considered as an exaction by the state for the privilege of doing business within the state. See

---

2. Aldens asserts that *National Bellas Hess* is not a tax case because it does not involve a statute imposing a tax. Rather, it attempted to impose upon National the obligation to collect from its customers the tax and to turn over those taxes to the state. However, the Court analyzed the case in the same due process terms as it does cases involving taxes on interstate commerce. See Central R.R. v. Pa., 370 U.S. 607, 618, 82 S.Ct. 1297, 8 L.Ed.2d 720 (1962) (Black, J., concurring). Other cases involving the obligation of out-of-state businesses to collect the use tax have been traditionally treated in the same manner as cases involving the imposition of a direct tax upon the business. See Developments in the Law—Federal Limitations on state taxation of interstate business, 75 Harv.L.Rev. 953, 994–1000 (1962).

Breard v. Alexandria, 341 U.S. 622, 638, 71 S.Ct. 920, 95 L.Ed. 1233 (1951). When that business is purely interstate in nature, a licensing requirement is unconstitutional under the commerce clause because the states are prohibited from imposing conditions upon the right to engage in interstate commerce.

■ The statute involved in the case at bar is distinguishable from taxing and licensing statutes in that it involves an exercise of the state's police power to protect local customers from overreaching and deception. The state has considerable power in this area even though interstate commerce is affected. See Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). Plaintiff does not contest the power of the Commonwealth to regulate service charge rates for revolving credit accounts, or the reasonableness of the 15% ceiling. Indeed, Plaintiff has advised the Court that 41 states plus the District of Columbia regulate at various rates service charges in revolving credit accounts. We are not here dealing with an exaction for the privilege of doing business with Pennsylvania residents, but with a statute reasonably calculated to protect consumers residing in Pennsylvania from unfair credit practices. This is a crucial distinction. Thus, the state need not demonstrate a benefit conferred upon Aldens in exchange for the right to regulate its transactions with Pennsylvania residents.

The Plaintiff points out that every case upholding a statute seeking to protect the public's health, safety, morals, or welfare involves some local activity or physical presence of the regulated entity within the regulating state. However, the physical presence is often transitory. Thus, a state can regulate the highway speed of trucks engaged solely in interstate commerce, South Carolina State Highway Department v. Barnwell Bros., 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734 (1938), or control the emission of smoke from ships involved in interstate commerce while the ships are docked at the port of the regulating jurisdiction. Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L. Ed.2d 852 (1960). The interest of the state in protecting its citizens is so strong that the state may even prohibit certain dangerous products from entering the state at all. Rasmussen v. Idaho, 181 U.S. 198, 21 S.Ct. 594, 45 L.Ed. 820 (1901); Missouri, K. & T.R. Co. v. Haber, 169 U.S. 613, 18 S.Ct. 488, 42 L. Ed. 878 (1898). In these quarantine cases, local activity or physical presence within the state is obviously absent.

■■ In my view, application of the Pennsylvania Goods and Services Installment Sales Act to Aldens does not depend upon Aldens' physical presence in Pennsylvania. Aldens' annual solicitation of over two million Pennsylvania residents and its sales to Pennsylvania residents in an amount of almost $15,000,000 per year indicates an exploitation of the Pennsylvania market and requires Aldens to conform with the Act which protects Pennsylvania consumers in those types of transactions in which Aldens engages. To hold otherwise would expose Pennsylvania consumers to the type of credit sales practices which the Pennsylvania legislature deemed unfair and prohibited in Pennsylvania. In Robertson v. People of State of California, 328 U.S. 440, 459–460, 66 S.Ct. 1160, 1170, 90 L.Ed. 1366 (1946), the Supreme Court, in upholding provisions of the California Insurance Code which prohibited the sale of insurance in California by unadmitted foreign insurance companies stated the following:

"It is quite obvious . . . that if appellant's contentions were accepted and foreign insurers were to be held free to disregard California's reserve requirements and then to clothe their agents or others acting for them with their immunity, not only would the state be made helpless to protect her people against the grossest forms of unregulated or loosely regulated foreign insurance, but the result would be inevitably to break down also the

system for control of purely local insurance business. In short, the result would be ultimately to force all of the states to accept the lowest standard for conducting the business permitted by one of them or, perhaps, by foreign countries."

Similarly, if Pennsylvania cannot regulate the finance charges of mail order businesses, then the ultimate result could be that all retailers would do business through the mails from a state whose service charge ceiling was the highest. I have concluded that the Act does not violate the commerce clause on the ground that it is regulation purely of interstate commerce.

■■ There remains to be considered whether application of the Act to Aldens constitutes an undue burden upon interstate commerce. On this issue, Plaintiff again relies on *National Bellas Hess* which apparently held that the obligation of National to collect use taxes constituted an undue burden upon interstate commerce because of the danger that thousands of different taxing jurisdictions could impose a similar obligation upon National's business thus entangling that interstate business in a "virtual welter of complicated obligations to local jurisdictions with no legitimate claim to impose 'a fair share of the cost of the local government.'" 386 U.S. at 760, 87 S.Ct. at 1393. (emphasis added). A simple answer to this position is that the Act in question has as its purpose the protection of consumers, and it does not impose a tax which can only be justified by a finding that the state has given something for which it can ask return. Unlike the *National Bellas Hess* situation, we are not here dealing with "unjustifiable local entanglements" because pursuant to Pennsylvania's police power, the "entanglements" are justifiable. Furthermore, at most Aldens would be subject to regula-

tion by 50 states, not the more than 2,300 jurisdictions which were the concern of the Court in *National Bellas Hess*. 386 U.S. at p. 759, n. 12, 87 S.Ct. at p. 1393. I would not find undue burden in the fact that Aldens will be forced to incur additional costs of preparing catalogs, advertising materials, credit agreements, etc. in the amount of $53,000.00 in light of the almost $15,000,000 gross annual sales to Pennsylvania consumers.[3] Nor do I consider it important that Aldens would incur expenses of $320,000 per year if it were required to comply with the varying statutes in those states which presently regulate revolving charge agreements. Not only is the necessity of this expense speculative, but it represents only a very small percentage of Aldens' gross sales. The cost which Aldens will or might incur as a result of compliance with the Act could be of relevance on the issue of undue burden if there were other factors constituting burden. Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 528, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959). However, Aldens has not shown such other factors. The application of the Act would not constitute an undue burden upon interstate commerce. Therefore, I have concluded that the national interest in the free flow of interstate commerce does not outweigh the interest of Pennsylvania in protecting its consumers from unreasonable service charge rates on installment credit accounts.

II. Due Process.

■ Plaintiff next contends that the application of the Act to Aldens is a violation of the due process clause of the 14th Amendment in that it is an attempt to regulate extra-territorial activity of Aldens and because there are no minimum contacts with Pennsylvania. Plaintiff again relies upon *National Bellas Hess* but, as noted above, the due

---

3. I do not consider relevant the $750,000 loss of service charge revenue from Pennsylvania customers which Aldens would incur as a result of the 15% maximum service charge rate. This is the amount which the Pennsylvania legislature considered to be in excess of a fair rate.

process analysis in that case is not necessarily applicable to the situation in the case at bar. "It is the nature of the state's action that determines the kind or degree of activity in the state necessary for satisfying the requirements of due process." Travelers Health Association v. Virginia, 339 U.S. 643, 653, 70 S.Ct. 927, 932, 94 L.Ed. 1154 (1950) (Douglas, J., concurring). This proposition is best demonstrated by the fact that in *National Bellas Hess* and in the case at bar, there are sufficient contacts between National and Aldens and the two states involved to permit the exercise of in personam jurisdiction over National and Aldens. See McGee v. International Life Insurance Company, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). The "minimum contacts" necessary to satisfy due process as to the applicability of a state regulatory statute to an out-of-state entity need not be as extensive as those required in a tax case. In Travelers Health Association v. Virginia, *supra*, the Supreme Court upheld both service of process and the state's Blue Sky Law as applied to an out-of-state mail order insurance company. The only physical presence of the insurance company was the unpaid activities of those already members who were encouraged to recommend other possible customers to the insurance company. Although this informal type of solicitation is not present in the case at bar, Aldens' extensive solicitation by mail and exploitation of the Pennsylvania market present in this case constitute a minimum connection between Aldens and Pennsylvania sufficient to justify application of the Goods and Services Installment Sales Act against Aldens. This analysis was employed by the three dissenters in *National Bellas Hess*. Despite the fact that the majority rejected this test of "minimum contacts" in the tax situation, it is applicable in my view to Pennsylvania's valid exercise of its police power. I conclude, therefore, that application of the Goods and Services Installment Sales

Act to Aldens does not deprive Aldens of the due process of law.

III. Right to Use the Mail.

Finally, Aldens contends that the act infringes upon Aldens' constitutional right to use the United States mails because all of its contacts with Pennsylvania residents are through the U.S. Mails. However, the Act in no way attempts to regulate what Aldens may send through the mail. It only provides that Aldens cannot charge its Pennsylvania customers more than 15% annually on an installment account. Only when state control involves a "direct, physical interference with federal activities under the postal power or some direct, immediate burden on the performance of the postal functions" will state regulation be deemed unconstitutional. Railway Mail Association v. Corsi, 326 U.S. 88, 65 S.Ct. 1483, 89 L. Ed. 2072 (1945). Plaintiff's postal clause argument is without merit.

In conclusion, then, I have determined that the Goods and Services Installment Sales Act is constitutional as applied to Aldens' transactions with Pennsylvania residents, and therefore Aldens' motion for summary judgment and request for declaratory judgment must be denied.

IV. Defendant's Counterclaim.

It must next be determined whether Defendant is entitled to summary judgment on his counterclaim or whether Plaintiff's motion for judgment on the pleadings as to Defendant's counterclaim should be granted. As noted above, the counterclaim seeks a declaratory judgment that the Act is constitutional as applied to Aldens and a request for an injunction against Aldens' future noncompliance with the Act. There are several problems in Defendant Packel's assertion of his counterclaim in this case. First, F.R.Civ.P. 13 refers to counterclaims against an "opposing party." The counterclaim seeking a declaration that the Act is constitutional and for an injunction against Aldens' further non-

compliance with the Act belongs to the Commonwealth, not to the Attorney General. Defendant has cited no case which would confer upon him the power to bring an action in his own name which seeks to enforce a state statute. Thus, under F.R.Civ.P. 13, it would appear that Aldens and Defendant Packel are not opposing parties for the purposes of this counterclaim. A similar analysis leads the Court to conclude that Defendant Packel is not the real party in interest in regards to the counterclaim as required by F.R.Civ.P. 17.

 Putting aside these problems of whether Defendant Packel is the proper party to assert the counterclaim, there are additional reasons why the counterclaim is improper in this case. Defendant's request for a declaration that the Act is constitutional as applied to Aldens brings into question issues which have already been presented and decided by this opinion in favor of Defendant. The Court's decision in this case that the Act is constitutional adequately protects the Defendant and the Commonwealth, and therefore, Defendant's request for declaratory judgment is moot. See Cover v. Schwartz, 133 F.2d 541 (2d Cir. 1943), cert. denied, 319 U.S. 748, 63 S.Ct. 1158, 87 L.Ed. 1703; Larson v. General Motors Corp., 134 F.2d 450 (2d Cir. 1943), cert. denied, 319 U.S. 762, 63 S.Ct. 1318, 87 L.Ed. 1713; see generally, Wright and Miller, Federal Practice and Procedure, § 1406.

In his counterclaim, Defendant also seeks an injunction against Aldens. In my view, the Court cannot grant this injunctive relief to the Defendant because the Defendant could not obtain that type of relief in the state court system. Nowhere in the Act is the availability of injunctive relief mentioned.[4] The penalties for a violation of the Act are listed in Article XII of the Act and include conviction for a misdemeanor, 69

P.S. § 2201, and a private right of action on the part of the buyer for recovery of any time price differential or service charge, 69 P.S. § 2202, and in some cases, treble damages. 69 P.S. § 2204. This situation is clearly controlled by the case of Commonwealth v. Glen Alden Corp., 418 Pa. 57, 210 A.2d 256 (1965), in which the Supreme Court of Pennsylvania held that injunctive relief would not lie in a controversy where the legislature had provided a statutory procedure for its resolution. Defendant has directed the Court's attention to no case which has held that injunctive relief would be available under these circumstances.

The Court has concluded that Defendant's counterclaim is improper, and that therefore, Defendant's motion for summary judgment on that counterclaim must be denied. Plaintiff's motion for a judgment on the pleadings as to the counterclaim will be granted.

An order in conformance with this Opinion will be entered.

---

4. There is presently before the Pennsylvania legislature a bill which would modify the Act to include, *inter alia*, a provision enabling the Attorney General to enforce the Act by seeking an injunction. Senate Bill #1473,

Session of 1974, § 1203. This fact lends support to Plaintiff's position that if injunctive relief were available under the Act, it would have been specifically provided.