469 Pa. 292 (1976)
365 A.2d 649
GENERAL ELECTRIC CORPORATION
v.
COMMONWEALTH of Pennsylvania, PENNSYLVANIA HUMAN RELATIONS COMMISSION, Appellant.
Supreme Court of Pennsylvania.
Argued March 9, 1976.
Decided October 20, 1976.
*293 *294 *295 Katherine H. Fein, Asst. Gen. Counsel, Pittsburgh, Sanford Kahn, Gen. Counsel, Pa. Human Relations Comm., Harrisburg, for appellant.
Frederick N. Egler, Egler & Reinstadtler, Pittsburgh, for appellee.
Before JONES, C.J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

OPINION OF THE COURT
POMEROY, Justice.
On September 19, 1971, Agnes Stokles, Anna Katynski and Mary Kush filed a complaint with the Pennsylvania Human Relations Commission [hereinafter "the Commission"] on behalf of themselves and all other similarly situated female employees of appellee, General Electric Corporation, alleging that General Electric had engaged in sexually discriminatory practices in violation of Section 5(a) of the Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, Section 5(a), as amended, 43 P.S. § 955 (a) (Supp. 1974-1975).[1] Specifically, the complaint alleged that General Electric "failed to offer the complainants and other female employees similarly situated the same terms and conditions to secure full time employment after phasing out the coil department because of their sex, female, while offering less senior *296 males of the same work unit full time employment in all areas not effected [sic] by the elimination of the coil department". After a hearing the Commission found that General Electric had violated Section 5(a) and entered a final order prescribing remedies not here at issue.[2] General Electric appealed and the Commonwealth Court reversed the Commission. General Electric v. Pennsylvania Human Relations Commission, 18 Pa.Cmwlth. 316, 334 A.2d 817 (1975). We granted allocatur and now reverse.[3]
It is well established that the findings of the Commission may not be disturbed on appeal if they are in accordance with the law and are supported by substantial evidence. Act of June 4, 1945, P.L. 1388, § 44, 71 P.S. § 1710.44; Pennsylvania Human Relations Commission v. Chester Housing Authority, 458 Pa. 67, 327 A.2d 335, cert. denied 420 U.S. 974, 95 S.Ct. 1396, 43 L. Ed.2d 654 (1974); Slippery Rock State College v. Pennsylvania Human Relations Commission, 11 Pa.Cmwlth. 501, 314 A.2d 344 (1974); Straw v. Pennsylvania Human Relations Commission, 10 Pa.Cmwlth. 99, 308 A.2d *297 619 (1973). The Commonwealth Court reversed the Commission not because its factual findings were unsupported by the record but because its conclusions of law were found to be erroneous. The issues raised in this appeal relate to the correctness of these legal conclusions. In order for these conclusions to be understood, however, it will first be necessary to recite the uncontested factual findings of the Commission. This is done in Part I of the Opinion. In Part II we explore the legal issues and state the reasons why the decision of the Commonwealth Court must be reversed.

I
Prior to the "phase-out" of the coil department in General Electric's Pittsburgh Apparatus Shop, Agnes Stokles, Mary Kush and Anna Katynski had been employed in that department as coil tapers[4] for continuous periods ranging from thirty-six to twenty-two years. The position of coil taper, like all positions in the Pittsburgh shop, was classified by two methods. The first was through a job hiring classification system which consisted of a number preceded by an "R" prefix [hereinafter "R rating"]. The lowest hiring classification was an R-4, the highest R-25. The R classification both denoted one's base pay and also determined one's ability to transfer to equivalent R rated positions or to bump into equivalent or lower rated jobs.
Each job within the shop had a range of maximum and minimum R classifications which could be assigned to it. Within the coil department there were four such subdivisions of R classifications. These were designated from highest to lowest by the letters "A", "B", "C" and "D" respectively. Within the coil department of the Pittsburgh shop all female employees had been hired as coil workers C or D and none had an R rating in excess *298 of R-9. All but three male employees, on the other hand, were employed as coil workers A or B and had R ratings in excess of R-11. As a consequence they enjoyed more advantageous transfer and bumping rights. The three named complainants were all coil workers C with an R-9 classification.
In addition to the bumping and transfer privileges mentioned above, these were two methods through which an employee in the Pittsburgh shop could broaden his or her base of work experience. The first method allowed employees in lower rated positions to bid on unfilled vacancies in higher rated positions. Only one woman had attempted to exercise this bidding right prior to 1969[5], and no woman has made such an attempt since General Electric initiated during that year a policy of actively encouraging female employment. The complainants contended that females did not bid for such jobs because it was commonly understood that all jobs other than that of coil taper were "male" jobs to which no female would be assigned. The Commission found, however, that while such an attitude may have existed, it was not the result of any overt or passive policy on the part of General Electric.
The second method of obtaining broader work experience was through "road work" which was assigned by departmental supervisors from time to time to various employees within the coil department. "Road work" consisted of trips to outlying General Electric facilities to repair electrical equipment which was too large to bring back to the Pittsburgh shop. In making these repairs employees received training in skills which they would not have otherwise obtained within the coil department. Significantly, with one exception, women *299 were never invited to engage in such road work.[6] General Electric attempted to justify this exclusion on the ground that the female employees seemed engrossed in their work and that they would not have been capable of undertaking the assignments.[7] The Commission found that this procedure had a "disparate impact" on females.
At the end of 1970 General Electric decided to phase out the coil department. At that time the department employed twenty-one female and twenty male employees. The company offered to transfer the employees to a new operation in Ohio or to attempt to find positions for them elsewhere in the Pittsburgh shop. Lay off and transfer decisions were to be made in accordance with the local labor-management contract. This provided: "Lay-offs and transfers due to lack of work will be made in accordance with the length of continuous service within the affected occupational group. However, ability will be given consideration."
During the early part of 1971 General Electric completed the phase-out of the department. Of the twenty-one female employees, sixteen were laid off, four were offered part-time positions and one retired.[8] Of the *300 twenty male employees, sixteen were transferred into full time positions, three bumped into full time positions and one was laid off. Most of the males who bumped or were transferred into other positions by General Electric had less seniority than the women who were laid off. Few of the men had ever held, even temporarily, the job positions to which they were transferred. Transfer decisions were, in many instances, based upon a supervisor's personal familiarity with experiences which the male employees had had outside of their employment at General Electric. These experiences were not reflected in the employees' official record but were nevertheless relied upon to determine whether a male employee had the aptitude or experience to fill a given opening. No effort was made to ascertain whether any of the female employees had similar job-related experiences which did not appear on their records. In other instances, General Electric retained male employees because of the training they had received during various road work assignments.
It was on the basis of this evidence that the Commission concluded that General Electric had engaged in unlawful employment practices in violation of Section 5(a) of the Act. In particular, the Commission concluded that General Electric violated the Act by failing to take affirmative action to dispel an erroneous feeling among its employees that certain jobs were for males and certain jobs were for females; by retaining the female employees in the lowest job classifications and thus limiting their rights to bump; by failing to ascertain the females' general work experience and qualifications for available positions on an equal basis with male employees; by training males to fill positions for which they had no previous experience while failing to offer females the same opportunities to be trained for new positions; and by following general procedures during the phase-out which had a disparate impact upon the female employees' job opportunities. The Commission also concluded that *301 the statutory requirement of proving that the complainants were the "best able and most competent to perform services required" was not applicable under the circumstances of this case.

II

A.
Section 5(a) of the Pennsylvania Human Relations Act reads in relevant part:
"It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification. . .:
(a) For any employer, because of the . . . sex. . . of any individual to refuse to hire or employ, or to bar or to discharge from employment such individual, or to otherwise discriminate against such individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment, if the individual is the best able and most competent to perform the services required." (emphasis added)
The first issue raised on this appeal is whether the underscored language imposes upon a complainant the burden of proving as part of a prima facie case that he or she is "the best able and most competent to perform the services required". In the instant case the complaints undertook no such showing. The Commission ruled that where the discriminatory practice consists of a failure to evaluate a female worker's qualifications and where there is evidence that experience was not the employment criterion the "efficacy" of the "best able" requirement of Section 5(a) is "vitiated". Relying on two previously decided cases which had cast the burden on the complainant, the Commonwealth Court disagreed. G.C. Murphy Company v. Commonwealth of Pennsylvania, Human Relations Commission, 12 Pa.Cmwlth. 20, 314 A.2d 356 (1974); Romain v. Middletown Area School District, 1 Pa.Cmwlth. 419, 275 A.2d 400 (1971). As a consequence, *302 the court concluded that the complainants had failed to meet their burden of proof.
This Court has not heretofore had occasion to consider the "best able and most competent" clause of Section 5(a). In doing so we are, of course, required to ascertain as best we can what the legislature intended to express in the italicized language quoted above. In this process we are to be guided by the directive of the legislature in the Act itself that "[t]he provisions of [PHRA] shall be construed liberally for the accomplishment of the purposes thereof." Act of October 27, 1955, P.L. 744, as amended 43 P.S. § 962. These purposes are legislatively declared in the Act as follows:
"It is hereby declared to be the public policy of this Commonwealth to foster the employment of all individuals in accordance with their fullest capacities regardless of their . . . sex . . . and to safeguard their right to obtain and hold employment without such discrimination [and] to assure equal opportunities to all individuals . . ." Act of October 27, 1955, P.L. 744, § 2 as amended 43 P.S. § 952(b).
Thus approached, the choice of placing on a complainant the burden of proving the superiority of his or her abilities as part of establishing a prima facie case, on the one hand, or of requiring an employer to assert the "best able" proviso in defending a challenge to an employment decision becomes relatively easy, for we must adopt a construction which, without doing violence to the language of the statute, best promotes the goal of equal employment opportunities. We believe that the legislature intended that it is the employer who should shoulder the burden of demonstrating that the complainant was not "best able and most competent to perform the services required." This conclusion is supported by two principal considerations, one conceptual and the other pragmatic.
*303 Our decision is primarily rooted in certain principles of fair employment law which have emerged relative to the federal analogue to Section 5(a) of the PHRA-Title VII of the Civil Rights Act 1964. 42 U.S.C.A. 2000e-2(a) [hereinafter "Title VII"]. Fair employment laws embody an attempt to reconcile two distinct and, at times, competing social interests  the interest in ending all vestiges of discrimination, and the interest in promoting an efficient and productive economy. Employment decisions must not, of course, be allowed to be made on the basis of a person's sex, and decisions so based must not be permitted to be justified by perfunctory resort to claims of economic efficiency. But just as surely fair employment laws were never intended to interfere with employment policies which maximize efficiency and productivity simply because those policies have an unintended discriminatory impact.[9]
As a consequence, the federal courts have recognized that the unintended discriminatory impact of an employment policy may be justified under Title VII if that policy is necessary for the safe and efficient operation of the *304 enterprise. The doctrine, known as the "business necessity doctrine," is not to be found in the language of Title VII; it was engrafted onto the statute by the United States Supreme Court in its decision in Griggs v. Duke Power Company, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971):
"Congress did not intend by Title VII, however, to guarantee a job to every person regardless of his qualifications. . . the touchstone is business necessity. If an employment practice which operates to exclude negroes cannot be shown to be related to the job performance the practice is prohibited." 401 U.S. at 430-31, 91 S.Ct. at 853, 28 L.Ed.2d at 164.
The burden of demonstrating the justification for an employment policy which produces a discriminatory impact has uniformly been placed upon the employer.[10]
In McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the United States Supreme Court held that a prima facie case of discrimination under Title VII is made out if the complainant establishes that he is a member of a protected minority, that he applied for a job for which he was qualified, that his application was rejected and that the employer continued to seek other applicants of equal qualification. 411 U.S. at 800, 93 S.Ct. at 1823, 36 L.Ed.2d at 677.[11] *305 Once a complainant establishes these elements the burden then shifts to the employer to justify his employee selections on the basis of job-related criteria which are necessary for the safety and efficiency of the enterprise. 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed. at 678.[12] As one court has put it:
"[W]hen dealing with a humanitarian remedial statute which serves an important public purpose, it has *306 been the practice to cast the burden of proving an exception to the general policy of the statute upon the person claiming it." Weeks v. Southern Bell Tel. & Tel. Co., 408 F.2d 228, 232 (5th Cir. 1969).
We agree with this rationale.
With these teachings in mind we conclude that the "best able and most competent" clause of Section 5(a) of the PHRA is best read as an expression of the business necessity doctrine.[13] The purpose of the clause is to protect employers from having to select employees who do not meet their qualification standards. In essence, it serves as a limitation upon the right to equal employment broadly bestowed upon the citizens of this Commonwealth by the PHRA. We believe that notions of fairness and common sense dictate that the burden of establishing such a limitation should fall upon the party in whose favor the limitation is designed to operate. Such a conclusion is in accord with the developments in fair employment law in the federal courts and we have been presented with no reasons which persuade us that the language of Section 5(a) should be read otherwise.
Moreover, our decision is supported by certain pragmatic considerations. The employer has far easier access *307 to the facts which must be established in order to prove the relative qualifications of those employees who were retained and those employees who were laid off in any given work curtailment situation. Where objective criteria have been employed, the employer is in the better position to demonstrate which standards were used and whether they were applied in a nondiscriminatory manner. Where employment decisions have been based upon the employer's subjective assessments, it is the employer alone who can articulate the rationale behind his decisions.[14]
To cast the burden of establishing one's relative qualifications on the complainant would, in both objective and subjective situations, impose significant obstacles of time and expense which could serve to deter vigorous enforcement of the rights conferred by the statute. In the case where subjective standards have been employed the burden of proving relative qualifications might well be an impossible one. In either event, however, effective enforcement of the PHRA seems best promoted by casting the burden on the employer to demonstrate that the female worker was not best qualified. Such a solution best advances the salutory purposes of the PHRA and is in accord with accepted notions of allocation of burden of proof:
"If the existence or non-existence of a fact can be demonstrated by one party to a controversy much more easily than by the other party, the burden of proof *308 may be placed on that party who can discharge it most easily." Barrett v. Otis Elevator Company, 431 Pa. 446, 452-453, 246 A.2d 668, 672 (1968).

B.
During the course of the hearing, General Electric objected to the introduction of all evidence pertaining to alleged discriminatory practices which occurred prior to April 14, 1971, the date specified in the complaint as the time when the alleged discriminatory practices began. General Electric alleged that such evidence was irrelevant to prove the violations which were charged. The Commission ruled that evidence of practices which took place subsequent to the effective date of the sex amendment to Section 5(a) (July 1, 1969) was admissible to establish the substance of the charge, notwithstanding that such evidence might pertain to events which occurred prior to the discriminatory acts here complained of; evidence of practices which pre-dated the effective date of the amendment was admitted for the limited purpose of establishing the state of mind of the complainants as to whether certain jobs were commonly considered to be "male" jobs. The Commonwealth Court concluded that to the extent that the Commission relied upon evidence of practices which pre-dated the Act it acted improperly. In its view, evidence of such practices is relevant only to establish those types of violations which are akin to a conspiracy to thwart the purposes of the Act in contemplation of its passage by the legislature. Accordingly, the court held that the introduction of such evidence in this case was impermissible even for the limited purpose of establishing state of mind. We cannot agree with the Commonwealth Court.[15]
*309 Section 5(a) was enacted in part to put an end to those invidious, discriminatory policies and practices which have in the past served to deprive women of equal employment opportunities. To this end the section outlaws such policies and stands as a guarantee that a woman's qualifications for the position she seeks will be evaluated with neutral objectivity. This statutory imposition of neutral employment requirements does not in itself, however, assure equal opportunities to the victims of past discriminatory practices; such persons still remain shackled by the already suffered deprivations of seniority rights, access to training programs, promotions and the like. Occasionally, a facially neutral employment policy incorporates as a criterion for employment a qualification which a female has been precluded from attaining by virtue of an abandoned discriminatory policy. In such an instance the impact of the past discriminatory practice is perpetuated and the former victim is deprived of equal employment opportunity just as surely as if she were the current object of an overt discriminatory practice. These considerations have led the United States Supreme Court to say: "Practices, procedures or tests, neutral on their face and even neutral in terms of intent, cannot be maintained if they operate to `freeze' the status quo of prior discriminatory employment practices." Griggs v. Duke Power Company, 401 U.S. at 430, 91 S. Ct. at 853, 28 L.Ed.2d at 163 (1971).
Circuit courts which have addressed the issue have uniformly held that facially neutral employment policies which have the practical effect of perpetuating the injustices of past discriminatory practices violate the provisions of Title VII.[16] These courts have reasoned that by *310 carrying forward the impact of abandoned discriminatory practices,[17] facially neutral policies violate the past victims' present right to be free of discriminatory standards. Because it is the impact of the present policy which violates Title VII, the federal courts have deemed it of no consequence that the impact is derived from an employment practice which was abandoned prior to the effective date of that Act.[18]
*311 In a like manner, we believe that present neutral standards which perpetuate the impact of abandoned discriminatory policies may be held to violate Section 5(a). Because it is the legality of the present policy, not the past practice, which is at issue we find no reason to limit the admissibility of such evidence to incidents which occurred after the effective date of Section 5(a).
For this reason we also reject General Electric's contention that the rule we announce deprives a respondent of its due process right to notice of the charges against which it must defend. General Electric argues that the introduction of such evidence charges it with a number of violations which were not specified in the complaint as a basis for relief. The introduction of such evidence does not, however, charge General Electric with additional violations. Abandoned practices which pre-dated the effective date of Section 5(a) are not and cannot be found to be illegal under the PHRA. The evidence is introduced solely to establish the discriminatory impact of a present employment policy. As such the evidence is relevant to establish the charge specified in the complaint and does not present the due process problem complained of by General Electric.[19]
*312 In sum, we hold that if an employer has in fact engaged in past discriminatory actions, and if the impact of these actions is perpetuated by the employer's otherwise neutral present employment policy, then that employer's present policy may be found to be in violation of Section 5(a) of PHRA.[20] Because evidence of these past actions is relevant to prove the substance of a complaint, the Commission did not err in admitting such evidence for the more limited purpose of establishing "state of mind."

C.
The sole question which remains to be decided is whether, in light of the standards we have announced today, the Commission acted properly in finding General Electric to be in violation of Section 5(a) of the PHRA. While at least one of the bases for such a finding could not be sustained[21] there are two grounds upon which we affirm the Commission's conclusions.
*313 First, the Commission concluded that "respondent violated Section 5(a) of the PHRA by discriminating against the instant complainants during the phase out of its coil department . . . by failing to ascertain the general work experience of the complainants on an equal basis as was done with the male employees of the department."
As noted in Part I of this opinion, many of the employees were retained by General Electric not because of work experience which was reflected on their official work record, but rather on the basis of the supervisor's familiarity with their personal backgrounds. Exemplary of the types of background which were relied upon to justify the transfer decisions are: time spent in the Signal Corps of the Navy, sporadic employment in an uncle's repair shop, and a "well-known" mechanical aptitude. In at least one instance, a male employee was retained because of his supervisor's subjective belief that he could do the job. No inquiry, however, was made into the personal backgrounds of the female employees to determine whether they might possess undisclosed job-related qualifications of a similar nature.
As discussed earlier, Section 5(a) entitles every female job applicant to have her qualifications for employment considered on an equal footing with those of a man.[22] When the qualifications of a female applicant are not considered at all, she is manifestly deprived of this entitlement. In the instant case, General Electric made a large number of its lay-off decisions on the basis *314 of personal background information relative to male employees, without making any effort to ascertain and evaluate the personal background of its female employees. Thus the appellee's employment decision was made, in effect, without consideration of the female workers' qualifications and in consequence violates Section 5(a).[23]
Second, the Commission found that female employees were not given the same opportunities as male employees to obtain various work experiences and that to the extent that such experiences were utilized as criteria for the transfer decisions, General Electric acted in violation of Section 5(a). We agree.
*315 General Electric retained at least some of its employees because of the experience which these workers had acquired in various road work assignments. As has been mentioned earlier, road work assignments were not generally made available to women.[24] The basic reason advanced as a justification for this policy was that the women were so engrossed in their coil taping jobs that they would not have been interested in such assignments. This conclusion, however, was not arrived at after individual consultations with the female workers, including complainants. It was, rather, an assumption based upon an undifferentiated, stereotypic appraisal of the women as a class; as such, it was plainly discriminatory.[25] The impact of this discriminatory practice was to deprive the women of an opportunity to acquire valuable skills. When General Electric relied upon these skills as a neutral criterion for job retention, it impermissibly perpetuated this discriminatory impact. See discussion II A of this opinion.
General Electric argues, however, that the training the men had received had actually made them better qualified than the women who were laid off and therefore that the retention of these male employees was justified. This is a bootstrap approach to Section 5(a) which we cannot accept. While an employer may generally justify his employment decision simply by demonstrating that the male employee is better qualified, such is not the case where women have been deprived of the *316 opportunity to obtain these qualifications through discriminatory employment policies.[26] In such instances the employer has a heavy burden of demonstrating not only that the qualifications are necessary for the performance of the job, but also that it is economically impractical for him now to train those women who have been previously deprived of the opportunity to learn the required skills.
In the instant case it is apparent that General Electric's decision was not based upon a justifiable concern that it would be too impractical and expensive to train female employees in those skills they would have otherwise acquired on road work assignments. General Electric made their lay-off decisions without inquiry into the relevant background experience of its female workers. It seems apparent that without such an inquiry General Electric could not have engaged in any meaningful, objective appraisal of the costs which would have been involved in a training program for women. Because no meaningful appraisal of costs could have been made, it is fair to assume that the ultimate employment decision was reached not because it would have been too expensive to train the women, but rather because the male employees had already received such training. Such a justification, however, is not a defense to the violation here charged.[27]
*317 Having found, contrary to the Commonwealth Court, that the complainants did not fail in meeting their burden of proof and that the proof was sufficient to sustain the decision of the Commission that General Electric had "committed an unlawful discriminatory practice under Section 5(a) of the Act," we must reverse the order of the Commonwealth Court which reversed the final order of the Commission and remand the case to the Commonwealth Court for such further proceedings as may be necessary.
It is so ordered.
MANDERINO, J., filed a concurring opinion in which ROBERTS and NIX, JJ., join.
JONES, C.J., dissents.
MANDERINO, Justice (concurring).
Although I concur in the result reached by the majority there is one important aspect of this case that I feel should be considered by the Commonwealth Court when the case is remanded for further proceedings.
The Commission concluded that General Electric "violated the Pennsylvania Human Relations Act by failing to take affirmative action to dispel an acknowledged, albeit erroneous, feeling amongst its employees that certain jobs at respondent's facility were for males and certain jobs at respondent's facility were for females." (Emphasis added.)
In passing on this point the Commonwealth Court in General Electric v. Commonwealth of Pa., Pa. Human *318 Relations Commission, 18 Pa.Cmwlth. 316, 325, 334 A.2d 817 (1975), concluded:
"The point here is that there is no statutory requirement that any employer take affirmative action to dispel feelings among its employees, and the failure to do so cannot, therefore, be found to be an unlawful discriminatory practice." (Emphasis added.)
I disagree with this conclusion of the Commonwealth Court, especially in view of the express language of the Human Relations Act. The Act itself provides that it is to be construed liberally ". . . for the accomplishment of the purposes thereof . . ." 43 P.S. § 962(a).
It should also be noted that this Court and the Commonwealth Court imposed an affirmative duty to desegregate upon a Housing Authority that contended it did nothing wrong and that segregation occurred simply because ". . . blacks do not want to live with whites and whites not with blacks." Pa. Human Relation's Comm. v. Chester Housing Auth., 458 Pa. 67, 327 A.2d 335 (1974). In that case we concluded:
"An unlawful discriminatory practice having been found to exist, the Commission is statutorily empowered `to take such affirmative action . . . as, in the judgment of the Commission, will effectuate the purposes of the Act . . .'" (Emphasis added.) 43 P.S. § 959 (Supp. 1974), 327 A.2d at 346.
I would hold, therefore, that if the facts indicate that the total work climate "chilled" the rights of the female employees to apply for jobs in certain categories for which they were otherwise qualified; that if as a result of this chilling effect discrimination in fact occurred; and that if the employer knew or should have known of the discrimination and did nothing to prevent it, a violation *319 of the Human Relations Act should be deemed to have occurred.
ROBERTS and NIX, JJ., join in this concurring opinion.
NOTES
[1] Section 5(a) provides in relevant part:

"It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification . . . (a) For any employer because of the . . . sex . . . of any individual to refuse to hire or employ or to bar or to discharge from employment such individual, or to otherwise discriminate against such individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment, if the individual is the best able and most competent to perform the services required."
For the purposes of convenience, the Pennsylvania Human Relations Act will hereinafter be referred to as "PHRA" or "The Act"; and Section 5(a) of the Act will be referred to as "Section 5(a)".
[2] The Commission ordered General Electric "to rehire or reassign all female employees formerly employed in the coil department who were laid off or reassigned because of the phase-out of that department on or after February 18, 1971 . . . into positions of the same nature and job titles as those positions held by male employees who were reassigned or promoted because of the phase-out of the coil department . . . who had less seniority than the female coil department employees." Under the terms of the order females are to be awarded jobs of the same nature and title as were awarded to less senior male employees and are to receive whatever on-the-job training may be necessary to achieve required competence. In addition, the female workers were awarded back pay from the date of their lay off.

It has not been asserted in this appeal that the Commission's order is beyond the scope of its authority; rather, all arguments are directed to the merits of the Commission's conclusions of law. Accordingly, we do not in this opinion address the validity of the scope of the Commission's order.
[3] This Court has jurisdiction over the instant appeal under the Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, § 204, 17 P.S. § 211.204(a).
[4] Coil tapers are responsible for wrapping insulation on wire coils of various diameters and lengths.
[5] The female employee who did inquire about the possibility of bidding for a higher rated job was dissuaded by her supervisor from doing so. The Commission did not, however, rely upon this incident to support its findings and, as a consequence, it is not pertinent to our inquiry.
[6] Road work assignments gave employees valuable experience, but normally resulted in a slight loss of income during the assignment period. Because most assignments lasted no more than a few days, the decrease in income did not generally deter employees from accepting these assignments. The only assignment which was ever offered to a female employee was for a five week period. It was rejected by the employee because she felt the loss of income would have been too great. No female worker has ever been offered the more usual one to two day road work assignment.
[7] Section 5(a) exempts from its proscriptions discriminatory practices which are based upon bona fide occupational qualifications. See note 1, supra. It is important to keep in mind that General Electric does not here contend that certain physical qualifications constitute bona fide occupational qualifications for these road work assignments.
[8] Because of the low R rating of the positions held by female workers there were only two lower rated positions into which they could have bumped  janitor and sweeper. None of the female workers elected this option.
[9] As one commentator has aptly put it:

"The employer's interest in wealth maximization and the rigors of the market place are generally acknowledged in fair employment laws. A fair employment law is a limited corrective strategy and the societal interests in efficiency is a major limitation. The interest in efficiency is compromised not only when the employer is required to take an `unqualified' worker but also when he is not allowed to choose the `best worker'. Thus, in the employment context if the individual's non-performance under the criterion indicates a lower productivity than that of another applicant (for example the applicant for a secretarial job who cannot type at all or cannot type as well as the best applicant), this criterion cannot be deemed the functional equivalent of [a racially based criterion] regardless of the individual's lack of responsibility for his non-performance. Past discrimination  the causal explanation that releases the individual from responsibility for his non-performance  becomes relevant only if the criterion is not indicative of productivity."
Fiss, A Theory of Fair Employment Laws, 38 U.Chi.L.Rev. 235, 303 (1968); See also Note, Business Necessity under Title VII of the Civil Rights Act of 1964; A Non-Alternative Approach, 84 Yale L.J. 98 (1974).
[10] See e.g. Frank v. Bowman Transportation Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Watkins v. Scott Paper Co., 530 F.2d 1159 (5th Cir. 1976); Peters v. Jefferson Chemical Co., 516 F.2d 447 (5th Cir. 1975); Wetzel v. Liberty Mutual Insurance Co., 508 F.2d 239 (3rd Cir. 1975) cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); Head v. Timken Roller Bearing Co., 486 F.2d 870 (6th Cir. 1973); Sperlock v. United Airlines, 476 F.2d 216 (10th Cir. 1972); C.C.H., EEOC Compliance Manual ¶ 3161.
[11] Although the McDonnell-Douglas case involved allegations of racial discrimination, the factors there announced have been applied with equal force in sex discrimination cases. See, e.g., East v. Romine, Inc., 518 F.2d 332 (5th Cir. 1975); Ostapowicz v. Johnson Bronze Co., 369 F.Supp. 522 (W.D.Pa. 1973). It should also be pointed out that the factors found in McDonnell to be sufficient to make out a case are not unwavering absolutes. In McDonnell-Douglas, the Supreme Court cautioned: "The facts necessarily will vary in Title VII cases and the specifications above of the prima facie proof required [by the complainants] are not necessarily applicable in every respect in differing factual situations." McDonnell-Douglas Corp. v. Green, supra at 802 n. 13, 93 S.Ct. at 1824, 36 L.Ed.2d at 677 n. 13.
[12] See cases cited note 10 supra. See also Gillin v. Federal Paper Board Co., 479 F.2d 97 (2nd Cir. 1973); Marquez v. Omaha District Sales Offices, Ford Div., 440 F.2d 1157 (8th Cir. 1971); Stacey, Title VII Seniority Remedies in a Time of Economic Downturn, 28 Vand.L.Rev. 487, 517 (1975); Note, Business Necessity Under Title VII of the Civil Rights Act of 1964: A Non-Alternative Approach, 84 Yale L.J. 98, 108 n. 51 (1974); Developments in the Law-Employment Discrimination and Title VII of the Civil Rights Act, 84 Harv.L.Rev. 1109, 1169 (1971). It should be noted that the federal courts have given the business necessity justification a restricted sweep. As one court has put it:

"Necessity connotes an irresistible demand. To be preserved, the [employment policy] must not only directly foster safety and efficiency of a plant, but also be essential to those goals.. . . If legitimate ends of safety and efficiency can be served by a reasonably available alternative with less discriminatory effects, then the present policies may not be continued."
United States v. Bethlehem Steel Corp., 446 F.2d 652, 662 (2nd Cir. 1971). Accord: Watkins v. Scott Paper Co., 530 F.2d 1159 (5th Cir. 1976); Palmer v. General Mills, Inc., 513 F.2d 1040 (6th Cir. 1975); Miller v. United States Steel Corp., 509 F.2d 923 (10th Cir. 1975); Peckway v. American Cast Iron Pipe Co., 494 F.2d 211 (5th Cir. 1974); Young v. Edgecomb Steel Co., 499 F.2d 97 (4th Cir. 1974); Head v. Timken Roller Bearing Co., 486 F.2d 870 (6th Cir. 1973); Robinson v. Lorrilard Corp., 444 F.2d 791, 798 (4th Cir. 1971). See also CCH, EEOC Compliance Manual Paragraph 3162; Blumrosen, Strangers in Paradise; Griggs v. Duke Power Company and Concept of Employment Discrimination, 71 Mich.L.Rev. 59, 82 (1972); Blumrosen, The Duty of Fair Recruitment Under the Civil Rights Act of 1964, 22 Rut.L.Rev. 465, 498 (1968); Note, Layoffs and Title VII: The Conflict between Seniority Employment Opportunities, 1975 Wisc.L.Rev. 791, 800; 14 Duq.L.Rev. 475 (1976).
Because a "best qualified" worker is arguably not essential to the efficiency of the operation, some cases and commentators have suggested that a "best qualified" justification may not be asserted as a defense to Title VII actions. See Watkins v. Scott Paper Co., supra at 1180, n. 29; Blumrosen, Strangers in Paradise; Griggs v. Duke Power Company and The Concept of Employment Discrimination, 71 Mich.L.Rev. 59, 85-86 (1972). Such a position would seem at odds with the authorities cited earlier in this note and with the limitation imposed upon the reach of Title VII by the United States Supreme Court in the language from Griggs v. Duke Power Company, supra quoted earlier in this opinion. In any event, Section 5(a) of the PHRA expressly states that the "best qualified" criterion is a factor to be considered and no argument is here raised that this provision of Section 5(a) is constitutionally inconsistent with Title VII of the federal act under the supremacy clause of the Constitution of the United States.
[13] We do not mean to say, of course, that the "best able" clause is co-extensive with the business necessity doctrine.
[14] Employment decisions predicated on subjective appraisals have been treated with particular suspicion and have generally been condemned. See, e.g., United States v. Hazelwood School District, 534 F.2d 805, 813 (8th Cir. 1976); Watkins v. Scott Paper Company, 530 F.2d 1159 (5th Cir. 1976); Miller v. United States Steel Corp., 509 F.2d 923 (9th Cir.) cert. denied 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975); Pettway v. American Cast Iron Pipe Company, 494 F.2d 211 (5th Cir. 1974); Roe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972). See also Cooper & Sobol, Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv.L.Rev. 1598 (1969).
[15] Technically, the evidentiary issue before us is whether evidence of practices which pre-dated the sex amendment is admissible for the limited purpose of establishing complainants' state of mind. For the reasons which follow in the text we conclude that such evidence is admissible for this limited purpose because it could properly be introduced for the broader purpose of proving the substance of the charge. We discuss the issue of the substantive use of pre-enactment evidence in order to avoid the impression that such evidence may be introduced solely for the purpose of establishing state of mind.
[16] See e.g. Senter v. General Motors Corp., 534 F.2d 511 (6th Cir. 1976); Watkins v. Scott Paper Co., 530 F.2d 1159 (5th Cir. 1976); Caplan v. International Alliance Theatrical and State Employees and Motion Picture Machine Operators, 525 F.2d 1354 (9th Cir. 1975); Taylor v. Safeway Stores, Inc., 524 F.2d 263 (10th Cir. 1975); Gamble v. Birmingham Southern Railroad Co., 514 F. 2d 678 (5th Cir. 1975); Palmer v. General Mills, Inc., 513 F.2d 1040 (6th Cir. 1975); Bowe v. Colgate Palmolive Co., 489 F.2d 896 (7th Cir. 1973); Head v. Timken Roller Bearing Co., 486 F.2d 870 (6th Cir. 1973); United States v. N.L. Industries, Inc., 479 F.2d 354 (8th Cir. 1973); Local 53 of International Association of Heat and Frost Insulators and Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969). This "perpetuation doctrine" has been applied to a variety of employment practices, e.g., departmental seniority systems. Watkins v. Scott Paper Co., supra; bidding systems, Head v. Timken Roller Bearing Co., supra; union nepotism rules, Local 53 of the International Association of Heat and Frost Insulators and Asbestos Workers v. Vogler, supra; union referral systems, United States v. Sheetmetal Workers International Association, Local 36, 416 F.2d 123 (6th Cir. 1969). The only circumstance where the rule has not been adhered to is where the use of a plant-wide seniority system during a period of economic decline results in the lay-off of a disproportionately high number of minority group members whose lack of seniority is attributable to discriminatory hiring policies now abandoned. See, e.g., Waters v. Wisconsin Steel Workers, 502 F.2d 1309 (7th Cir. 1974); Watkins v. United States Steel Workers Local 2369, 516 F.2d 41 (5th Cir. 1975); Jersey Central Power & Light Company v. Local 327, IBEW, 508 F.2d 687 (3d Cir. 1975). In these cases, however, the courts did not question the viability of the perpetuation doctrine. Rather they held that despite their discriminatory impact, plant-wide seniority systems fall within the statutorily provided exception to Title VII which removes from the coverage of that title all "bona fide" seniority systems. 42 U.S.C. § 2000e-2(b). Plant-wide systems are the only discriminatory systems which have been held to be "bona fide" within the meaning of this exception.
[17] It is of course, essential to such a claim to be able to establish: (1) That the prior policy was in fact discriminatory and, (2) That the present policy perpetuates the impact of the prior policy. See e.g., Bailey v. American Tobacco Co., 462 F.2d 160 (6th Cir. 1972).
[18] See, e.g., Gamble v. Birmingham Southern Railroad Co., 514 F.2d 678 (5th Cir. 1975); Headway v. American Cast Iron and Pipe Co., 464 F.2d 211 (5th Cir. 1974); Bailey v. American Tobacco Co., 462 F.2d 160 (6th Cir. 1972); United States v. Sheetmetal Workers International Association, Local 36, 416 F.2d 123 (6th Cir. 1969).
[19] General Electric has argued in the alternative that the Commission did not rely on this theory in its evidentiary ruling that it limited the admissibility of pre-1969 evidence to prove the "state of mind" of the complainants, and that in disregard of this limitation the Commission relied substantively on evidence of pre-1969 practices in reaching its conclusions of law. The nub of General Electric's argument is that many of the alleged discriminatory practices both post-dated and ante-dated the sex amendment to Section 5(a). This argument, however, proves too much. To the extent that these practices were continued past the effective date of the amendment, they could be considered by the Commission consistently with their evidentiary ruling. As there is nothing in the record which suggests that the Commission did not indeed rely upon these post-enactment practices, we see no reason for disturbing the Commission's decision on this basis.
[20] It should be emphasized that our present holding does not preclude an employer from relying upon a job criterion simply because the use of such a criterion would have the effect of perpetuating the impact of past discriminatory policies. As discussed more fully in part II A of this opinion, supra, an employer is freely allowed to utilize such a criterion provided he can justify its use. Our holding does nothing more than to force an employer to come forward with such a justification where his policies have a discriminatory impact on a class protected by Section 5(a).
[21] The Commission concluded that General Electric "violated the Pennsylvania Human Relations Act by failing to take affirmative action to dispel an acknowledged, albeit erroneous, feeling amongst its employees that certain jobs at respondent's facility were for males and certain jobs at respondent's facility were for females." Such a conclusion, however, is in the teeth of the Commission's own well-supported finding of fact that "although the atmosphere at General Electric may have induced a chilling effect on the proclivity of females to bid for higher rated positions, there is insufficient evidence for finding that this was the overt or latent policy of respondent in this regard." As we have pointed out earlier in this opinion, the past practices of an employer are of no consequence in a challenge to a present policy unless those past practices were themselves discriminatory. See note 16 supra and accompanying text. Where, as here, there is an express finding that there has been no previous discriminatory practice on the part of the employer, a conclusion that the employer presently discriminates on that basis cannot be sustained. See note 17 supra.
[22] The federal courts have held that employment procedures which do not equally weigh the qualifications of women with those of male applicants violate Title VII. See, e.g., East v. Romine, Inc., 518 F.2d 332 (5th Cir. 1975); Hahn v. Braniff Airways, Inc., 500 F.2d 161 (5th Cir. 1974); Gillin v. Federal Paper Board Co., 479 F.2d 97 (2nd Cir. 1973); Ostapowicz v. Johnson Bronze Co., 379 F.Supp. 522 (W.D.Pa. 1973).
[23] It is, of course, no defense to this violation that the male employees who were transferred to other positions within the company were qualified for those positions, or even that they were, perhaps, better qualified than the female employees who were laid off. The vice here is that the females were not given the consideration to which they were entitled by law. An employer may not defend against such a violation by a hindsight appraisal of the qualifications he failed to consider at the time of the selection. See e.g., Gillin v. Federal Paper Board Co., supra, n. 22. As one court has aptly said in discussing the propriety of excluding females from consideration on the basis of certain presuppositions as to physical characteristics:

"The premise of Title VII, the wisdom of which is not in question here, is that women are now to be on equal footing with men. . . . The footing is not equal if a male employee may be appointed to a particular position on a showing that he is physically qualified, but a female employee is denied an opportunity to demonstrate personal physical qualification. Equality of footing is established only if employees otherwise entitled to a position, whether male or female, are excluded only upon a showing of individual incapacity. . . . This alone accords with the Congressional purpose to eliminate subjective assumptions and traditional stereotype conceptions regarding the . . . ability of women to do particular work." Rosenfield v. Southern Pacific Co., 444 F.2d 1219, 1225 (9th Cir. 1971).
It should be noted, however, that if the sole violation is the failure to consider a female's qualifications and if the employer does establish that the male employee was in fact better qualified, then the only available remedy in the federal system would be an award of damages to the woman for the discriminatory action. See e.g., Gillin v. Federal Paper Co., supra. Whether a like remedy would be available under the Pennsylvania Statute is not now before us.
[24] See note 6 supra and accompanying text.
[25] Employment decisions which are based on stereotypic assumptions have been universally condemned where, as here, the assumption is not asserted as a bona fide occupational qualification. See, e.g., Watkins v. Scott Paper Co., 530 F.2d 1159 (5th Cir. 1976); Wetzel v. Liberty Mutual Ins. Co., 508 F.2d 239 (3d Cir. 1975); Long v. Sapp, 502 F.2d 34 (5th Cir. 1974); Hahn v. Braniff Airways, 500 F.2d 161 (5th Cir. 1974); Ostapowicz v. Johnson Bronze Co., 379 F.Supp. 522 (W.D.Pa. 1973). Note, Sex Discrimination By Private Employers: The Equal Employment Opportunities Act, 14 Washburn L.Rev. 557 (1975).
[26] One commentator has said: "[B]ut where the discriminatees' lack of qualifications is attributable at least in part to discrimination by [the employer] the justification which [the employer] should be required to provide for refusing to compensate for the past discrimination, should presumably be significantly greater. For this reason, in past discrimination cases of this sort it is important that an attempt be made to obtain evidence of the feasibility and cost of [the employer's] providing the training necessary to put members of the affected class in the position which they would be in but for the [employer's] past discrimination against them. See generally 82 Harv.L.Rev. 1598, 1632-36." CCH, EEOC Compliance Manual Paragraph 3164; See also CCH Employment Practice Guide Paragraph 994.
[27] The Commission based its order on the alternative finding that the evidence did not support General Electric's contention that its lay off decisions were based on the criterion of experience. This finding was based on evidence indicative that two years after the lay-offs the three named complainants were offered employment in higher rated positions for which they had had no prior experience. Because the Commission's decision may be affirmed on the grounds articulated in the text, it is unnecessary to determine whether the alternative finding was supported by adequate evidence.