**Hoover v. Pennsylvania Power & Light Co. Inc.**

C.P. of Northumberland County, no. CV-92-612.

*Frank Clark,* for plaintiff.
*C. Edward S. Mitchell,* for defendant.

SACAVAGE, *J.,* July 10, 1996—On April 6, 1992, Dale Hoover, plaintiff, filed a complaint against Pennsylvania Power & Light Company Inc., defendant, alleging that he, the plaintiff, suffers from a learning disability, namely dyslexia, a "handicap" which falls within the protections of the Pennsylvania Human Relations Act, and that the defendant discriminated against him because of the learning disability and passed over him for job vacancies and promotions within the company. This matter came before the court at a non-jury trial on April 22, 1996. Based upon the testimony presented, the court adopts the following findings of fact and conclusions of law.

## FINDINGS OF FACT

(1) Dale Hoover, plaintiff, was hired by Pennsylvania Power & Light Company, defendant, on or about October 22, 1984.

(2) Plaintiff was employed as a construction helper located at defendant's Brunner Island facility.

(3) The construction helper position often required plaintiff to work overtime and to be away from home overnight when plaintiff was working at other PP&L locations.

(4) Plaintiff voluntarily bid from the construction helper position to a handyman position also at PP&L's Brunner Island facility.

(5) Plaintiff was awarded the handyman position on March 5, 1990.

(6) Mr. Hoover has a learning disability, dyslexia, that affects his ability to read.

(7) In May 1990 and July 1990, plaintiff bid on two meter reader positions.

(8) A written examination was administered for each of the meter reader positions.

(9) Plaintiff requested a reader for the first examination.

(10) Plaintiff's request for a reader was denied.

(11) Plaintiff failed both examinations.

(12) Plaintiff did not request a reader for the second meter reader test.

(13) The job responsibilities for the meter reader position require extensive reading and writing.

(14) The meter reader job responsibilities are performed by the meter reader working alone.

(15) The meter reader is responsible for 19 or 20 separate routes which are required to be read at intervals not less than 26 calendar days and not greater than 36 calendar days.

(16) Each route contains between 250 and 1200 separate meters.

(17) The reading of the routes requires the meter reader to travel to the municipality where the route begins and to locate the starting point of the route by use of maps.

(18) From the starting point, the meter reader is required to locate the various meters by name, address,

meter number, location information and access information and then to read and record from the various meters the applicable utility consumption and to record any applicable changes in the company records pertaining to the customer and meter, and to also record other observations concerning meter condition, meter access and utility consumption.

(19) Utility consumption is determined by reading and interpreting different types of meters and recording the readings.

(20) The most frequently used meter design contains five circular dials, each containing the numbers one through 10, and each counter-rotating from the rotational direction of the preceding dial.

(21) The meter reader is required to read the five-dial mechanical meter from right to left and to determine the reading of each dial by the location in the rotation of the preceding dial.

(22) The meter reader is also required to continuously update the route information and company records pertaining to the name, meter number, account number, meter conditions, location and access information, hazard conditions and possible diversions.

(23) The meter reader performs his reading and recording function by use of a hand-held, multi-functional processor, which communicates by printed words in a view screen, and receives information by numbers, words and codes inputted by a keypad.

(24) The keypad contains function keys, number keys, letter keys, control keys, shift keys and arrow keys. The letter keys are used for the dual role of selecting commands and inputting information.

(25) The use of the command keys, control keys and arrow keys is communicated by written abbreviations and/or symbols on the keypad.

(26) In response to the use of the command keys, control keys and function keys, printed information, menus and/or codes appear in the view screen.

(27) The meter reader must respond to the written messages, menus or codes appearing in the view screen by pressing appropriate keys on the keypad.

(28) Use of the control key produces menus of code numbers and written explanations.

(29) There are in excess of 100 separate codes and messages.

(30) The meter reader must read the message and select and enter the applicable numerical code pertaining to the message.

(31) The same numbers are used for different messages depending upon the command key which has been depressed.

(32) The meter reader receives the necessary information and enters the required information by selecting keys from written descriptions, reading information in the view screen, selecting appropriate keys in response and entering the appropriate information by either selecting and entering a code corresponding with a predetermined written message, or entering a written message by use of the keypad.

(33) The processor is a computer, and the information entered therein is transferred to the PP&L mainframe computer system by use of a communications interface device.

(34) The use of the processor is taught by a written instruction manual which the meter reader is required to read.

(35) The information pertaining to the individuals' meters and accounts is transmitted to the meter reader by the processor, which communicates printed words in a view screen.

(36) In addition to the customer and account information data which is communicated by the processor, the processor also communicates by printed message the location of the meter, the manner in which access to the meter must be obtained and any known hazards which the meter reader may encounter in approaching the meter.

(37) At each meter location, the meter reader is required to record into the processor the meter reading obtained from the meter and to respond to requests from the processor shown in the view screen pertaining to the information inputted from the reading.

(38) The meter reader must also record into the processor by use of codes determined from menus of preselected messages applicable meter conditions and/or reasons for inability to read meters.

(39) If the menu of predetermined messages does not contain the applicable message, the meter reader must enter a written message by use of the applicable command key and code key for free form message and then print the applicable message into the processor by use of the keyboard.

(40) The meter reader must account for his or her time in route by recording into the processor by use of the command key, a prepared message from a menu of messages or a freeform message printed into the processor by use of the letter keys. All breaks taken during the reading of the route must be explained by inputting the applicable information into the processor.

(41) The meter reader must be prepared to communicate information to customers by use of doorknob hanging messages, some of which must be handwritten by the meter reader and others of which must be selected by reading pre-printed messages and selecting among pre-printed cards.

(42) Meter readers carry written pocket guides of instructions pertaining to the use of the hand-held processor.

(43) Meter readers carry written cards containing the various codes and messages, and instructions for operating the hand-held processor and refer to those cards to assist in the reading and operation of the hand-held processor.

(44) Meter readers are required to accept work assignments by written work orders which they must be able to read and understand to carry out the job requirements contained in the written work orders.

(45) As a result of plaintiff's efforts to become a meter reader, PP&L obtained psychological evaluations and testing of plaintiff to determine whether plaintiff could perform the essential functions of the job and whether plaintiff could benefit from any remedial training which would permit plaintiff to perform the essential functions of the job.

(46) David G. Thompson Ph.D., a clinical psychologist practicing in Hershey, Pennsylvania, performed a job competency/suitability determination, including a psychological evaluation and testing.

(47) The testing and evaluations by Dr. Thompson disclosed that plaintiff was unable to read any word contained in the test other than "in," and was unable to spell any word contained in the test other than "cat" and "run."

(48) Dr. Thompson testified that, in his opinion, plaintiff was unable to perform the essential functions of the job of meter reader and that plaintiff would remain unable to perform the job of meter reader so long as the job required reading.

(49) Dr. Thompson further testified that any accommodations suggested by plaintiff would not permit plaintiff to perform the essential functions of the job of meter reader and that he did not believe there were any accommodations which would permit plaintiff to perform the essential functions of the job.

(50) Michael W. Stetter D.Ed., a clinical psychologist and school psychologist from Harrisburg, Pennsylvania, performed a work aptitude assessment of plaintiff and an analysis of whether plaintiff could, by remedial effort, learn to perform the job of meter reader.

(51) The tests performed by Dr. Stetter demonstrated that plaintiff could not accurately record numerical information in excess of three digits.

(52) Dr. Stetter expressed the opinion, based upon his observations and test results, that plaintiff would not be able to accurately read and record meter readings from the five-dial mechanical meter most frequently used by PP&L.

## CONCLUSIONS OF LAW

Pursuant to the Pennsylvania Human Relations Act, "It shall be an unlawful practice unless based upon a bona fide occupational qualification . . . (a) for any employer because of the . . . non-job-related handicap or disability of any individual to refuse to hire or employ, or to bar or to discharge from employment such individual, or to otherwise discriminate against such individual with respect to compensation, hire, tenure,

terms, conditions or privileges of employment, if the individual is the best able and most competent to perform the services required." [1] Additionally, "non-job-related handicap" is defined in the Act as "any handicap or disability which does not substantially interfere with the ability to perform the essential functions of the employment which a handicapped person applies for . . . ." [2]

The plaintiff has the burden of proving a prima facie case of discrimination by establishing that (1) the plaintiff is a member of a protected class, (2) the plaintiff applied for a job for which he was qualified, (3) the plaintiff's application was rejected, and (4) the employer continued to seek other applicants of equal qualification.[3] If the plaintiff establishes the necessary elements, the burden then shifts to the employer to demonstrate that the plaintiff was not the best able and most competent applicant.[4]

In this case, the plaintiff clearly met his burden of proving that he was a member of the protected class and that his application for the meter reader position was rejected. However, the court does not believe the plaintiff established that he applied for a job for which he was qualified nor that the employer continued to seek other applicants of *equal* qualification. As set forth in the findings of fact, reading is clearly an essential function of the job of meter reader. Additionally, pursuant to the testimony of two experts, the plaintiff is

1. Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, as amended, 43 Pa.C.S. §955(a).

2. 43 Pa.C.S. §954(p).

3. *General Electric Corp. v. Pennsylvania Human Relations Commission,* 469 Pa. 292, 301-302, 365 A.2d 649, 655-56 (1976).

4. *Id.*

unable to read, has difficulty in recognizing written words and even has difficulty in transferring numbers from one location to another. Given the numerous job-related functions requiring the reading of written instructions and directions, transferring numbers from a meter to the hand-held processor and inputting written instructions into the processor regarding any discrepancies or problems at the various locations, plaintiff's dyslexia prevents him from performing these tasks.

While the defendant is required to make a reasonable accommodation of plaintiff's handicap whenever possible,[5] the employer is not required to create a new job,[6] nor does a "reasonable accommodation" require a modification of the essential nature of the program or impose an undue burden.[7]

In this case, the plaintiff and his expert suggested that the plaintiff could be accommodated by using a hand-held tape recorder to listen to any messages and to record any notations or problems that arose during the day. However, the testimony clearly indicated that the defendant has an elaborate system in place for the meter reader position, wherein the information is already contained in a hand-held processor, the information is input through the mainframe computer and transferred back into the mainframe once the route is complete. To require the employer to revise this system in order to accommodate the plaintiff, is clearly unreasonable. Several additional personnel would be required to take the information from the mainframe and place it into the tape recorder as well as transcribing the information

5. *Jenks v. Avco Corp.,* 340 Pa. Super. 542, 490 A.2d 912 (1985).

6. *Shoemaker v. Pennsylvania Human Relations Commission,* 160 Pa. Commw. 216, 643 A.2d 772 (1993).

7. *Buckno v. Penn Linen & Uniform Service Inc.,* 428 Pa. Super. 563, 566, 631 A.2d 674, 676 (1993).

to be placed into the mainframe at the end of the day. Further, to place the information already contained in the hand-held processor which consists of hundreds of codes, which leads to other codes, etc., etc., would be extremely burdensome and time-consuming and require additional personnel. This court, therefore, does not believe the suggestion offered by the plaintiff is a "reasonable accommodation."

The position of meter reader was eventually filled by the defendant from a choice of two other applicants, having equal seniority with the plaintiff. However, both applicants, including the person selected for the position, can read and successfully passed the written examination required. Although the employer continued to seek other applicants, clearly the applicants possessed *greater* rather than "equal" qualifications.

Consequently, the court finds in favor of the defendant.

### ORDER

And now, July 10, 1996, for the foregoing reasons, judgment is entered in favor of the defendant.