**Sheila Hickey GARVEY, Plaintiff,**

v.

**DICKINSON COLLEGE,
et al., Defendants.**

**No. CV–88–1924.**

United States District Court,
M.D. Pennsylvania.

Aug. 23, 1991.

Kenneth A. Wise, Harrisburg, Pa., for plaintiff.

Douglas B. Marcello, Thomas, Thomas & Hafer, Harrisburg, Pa., for defendants.

MEMORANDUM

McCLURE, District Judge.

## I. BACKGROUND

Plaintiff Sheila Garvey alleges in this Title VII action[1] that she was sexually harassed and subjected to discrimination from 1985 to 1987 while she was employed as a professor of drama at Dickinson College ("Dickinson") in Carlisle, Pennsylvania. In addition to Dickinson, Garvey names George Allan, Ph.D., as a defendant. Garvey alleges that Dickinson retaliated against her[2] by refusing to renew her teaching contract because she reported incidents of sexual harassment allegedly perpetrated by David Peck, her immediate supervisor and chairman of the drama department from 1985 to 1987.

The non-jury trial concluded June 17, 1991, and both sides presented extensive evidence. Plaintiff presented testimony from several witnesses in her case in chief. She testified on her own behalf and also introduced testimony from Susan Feldman, Ph.D., David Brubaker, Susan Nichols, Brad Bortner, Sandor Biro, Ph.D., Sigurd Jensen, and Thomas J. Peterson. Feldman is a professor of philosophy at Dickinson. Brubaker was chairman of the drama department at Dickinson and served as plaintiff's immediate supervisor from 1981 to 1985. Nichols is an associate dean at Dickinson and served as the affirmative action officer at Dickinson from 1985 through 1987. Brad Bortner was a student in the Dickinson drama department who was graduated in 1988. Biro is a set designer, who worked in the drama department at Dickinson during the Fall 1986 semester. Jensen is chairman of the theater department at Southern Connecticut State University ("SCSU"), where plaintiff currently teaches. Peterson is a professor of drama at SCSU. Plaintiff presented only her own testimony on rebuttal.

In their case in chief, defendants presented testimony from Dean Allan, Margaret Garrett, Truman Bullard, Ph.D., James Drake, David Kranz, Ph.D. and Christine Villardo. Allan is the dean at Dickinson. Garrett is an assistant dean. Bullard is chairman of the music department at Dickinson and served on one of the committees which evaluated plaintiff for contract renewal. Kranz is a professor of english at Dickinson who also served on one of the committees which evaluated plaintiff for contract renewal. Drake and Villardo are both members of the Dickinson drama department. Drake is a set designer, and Villardo teaches dance. Defendants presented no sur-rebuttal testimony.

Both sides also presented extensive documentary evidence.

After considering all of the evidence presented, we find that Garvey was not discharged in retaliation for reporting Peck's alleged sexual harassment of female faculty and students. We further find that the reason for her termination was the college's dissatisfaction with the quality of her work. Any claim based on the alleged incidents of harassment perpetrated by Peck against Garvey is barred by the statute of limitations. Based on these findings, we conclude that defendants did not violate federal or state anti-discrimination law, and will enter judgment in their favor. We will address the matter of attorneys' fees in a separate order after the parties have had an opportunity to brief the issues.

## II. FINDINGS OF FACT

Based upon the evidence presented at trial, the court makes the following findings of fact.

---

1. The Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., ("Title VII"). Plaintiff also asserts a cause of action under the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 951 et seq.

2. Title VII makes it unlawful for an employer to discharge or otherwise retaliate against an employee for reporting suspected sexual harassment at the place of employment. 42 U.S.C. § 2000e–2(a) (1988).

*Contract Renewal Decisions*

1. Evaluations for faculty renewal are conducted according to standards and procedures published in the Faculty Handbook ("handbook"). The handbook states that a professor's accomplishments in three areas, namely, teaching, scholarship, and community service (listed in descending order of importance), are considered in evaluating performance and deciding whether contract renewal is appropriate. Professors on a tenure track are typically evaluated at two-year intervals.

2. Factors which play a role in the evaluation of teaching include course content and organization, teaching style and methods. To gauge these factors, evaluators typically observe classes taught by the professor, review the course syllabus, speak with students in the class, and review course evaluation reports completed by the students.

3. Factors which play a role in the evaluation of scholarship include the number and quality of publications by the professor and other accomplishments which demonstrate mastery in his or her chosen field. In the field of drama, renewal candidates may be judged in this area on the basis of acting or performing, as well as other scholarly endeavors.

4. Factors which play a role in the evaluation of community service include service on college interdepartmental committees, and participation in community service organizations.

5. The college follows a three-tier system of review. Typically, the department chairperson makes a recommendation to the Faculty Personnel Committee ("FPC"), a standing committee whose function it is to conduct a further review and report its findings and recommendation on contract renewal to Dean Allan.

6. Dean Allan then, typically, meets with the professor, who has had an opportunity to submit a personal activities statement ("PAS") indicating what he believes

his significant accomplishments have been since the last renewal evaluation. The dean then typically reviews the PAS with the professor and also discusses the recommendation and findings of the FPC. Based on all of the information then before him, the Dean decides whether contract renewal is appropriate.

7. The administration's dissatisfaction with Garvey's performance at Dickinson dates back to her first evaluation conducted in 1983. At that time, the FPC noted serious weaknesses in her teaching, principally her disorganization and seeming inability to communicate the subject matter to students with clarity and conviction.

8. Similar deficiencies were noted in her 1985 evaluation. The FPC found her teaching disorganized, uninspired, unchallenging and "unevenly effective" and her directing similarly disorganized, ineffectual, at times. Troubled by these deficiencies, the FPC recommended that her teaching contract not be renewed. (D49).[3] Directing student theatrical productions was an important part of Garvey's responsibilities as a drama professor.

9. Although the Dean ultimately decided not to follow the FPC's negative recommendation, he advised Garvey in the letter informing her of his decision to renew her teaching contract for another two-year term that the deficiencies noted by the FPC would have to be "substantially cleared up" by the next renewal. (D16).

10. Garvey's next renewal evaluation was conducted during the 1986–87 school year. Due to the uneasy relationship between her and Peck, as well as to the fact that neither of them had tenure, and both were, in a sense, competing for tenure, Peck did not evaluate her performance. Instead, an Ad Hoc Committee was appointed to perform the initial, preliminary evaluation and submit a report to the FPC. The Ad Hoc Committee consisted of Dean Garrett, Truman Bullard and David Kranz. Garvey voiced no objection to this procedure or to the make-up of the committee.

---

**3.** We will refer to exhibits throughout the memorandum as P1, D2, etc., as shorthand for plain-tiff's exhibit 1, defendant's exhibit 1, etc.

11. After attending Garvey's classes, interviewing several of her students, viewing play rehearsals she directed, viewing a production she directed, and reviewing the course evaluations completed by her students, the Ad Hoc Committee found serious deficiencies in her teaching and directing. (Directing student productions constituted an important facet of Garvey's duties.) Committee members found that she did not make good use of class time, that there appeared to be no overall purpose, direction or plan for the class, that students did not appear to have a clear understanding of what they were doing, and that an overall conceptual framework for the course was lacking. (D126).

12. Garvey's performance in the other two areas of review, scholarship and community service, was judged to be somewhat more satisfactory, although there were some criticisms noted in those areas as well. The evaluators were troubled by the fact that her writing projects appeared to lack direction and focus, that she had changed direction several times and seemingly did not follow through on goals she set out to achieve. They were also troubled by her continuing inability or unwillingness to cooperate and work effectively with other members of her department and to put aside personal differences to work toward a team goal for the good of the students.

13. Based on these findings, the Ad Hoc Committee voted unanimously not to renew Garvey's teaching for another term and submitted its negative recommendation to the FPC.

14. At Garvey's suggestion, the FPC retained an outside evaluator to critique one of the student productions to gauge her competency as a director. The evaluator was a member of the American College Theater Festival—an organization which reviews college productions and whose members participate in evaluating such productions in a competition for the best college production nationwide. The evaluator, Alice Robinson, did not submit a favorable report on Garvey's production. Robinson found the choice of plays inappro-priate and found that the production lacked direction and purpose.

15. After reviewing the findings of the Ad Hoc Committee and conducting its own inquiry, the FPC determined that it would not recommend renewal to the Dean.

16. Dean Allan, confronted with negative recommendations from both the Faculty Personnel Committee and the Ad Hoc Committee, decided that Garvey's contract would not be renewed.

17. Garvey appealed the dean's decision to the Academic Freedom and Tenure Committee, and it affirmed the decision.

18. Garvey filed a complaint with the Pennsylvania Human Relations Committee ("PHRC") on August 18, 1987.

19. Garvey filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on November 16, 1987.

20. It was customary to offer a professor in Garvey's position a one-year "terminal contract" so that he or she could remain employed while seeking another position, and such a contract was offered to Garvey.

21. She accepted the offer, and taught at Dickinson during the 1987–88 school year. She left in May, 1988 and began teaching in the theater department at SCSU in September, 1988. Garvey continues to teach at SCSU.

22. Although Garvey is considered an effective and well-liked teacher at SCSU, that does not prove that Dickinson's expressed dissatisfaction with her performance was a mere pretext for terminating her. Many factors could account for an improvement in Garvey's performance— she has had more teaching experience, the demands placed on her by SCSU are different from those placed on her at Dickinson, since the SCSU theater department is different from the Dickinson theater department, etc.

23. At each level, all of Garvey's renewal evaluations were conducted in a fair and even-handed manner and every reasonable attempt was made to evaluate fairly the strengths and weaknesses of her performance in each of the three areas under con-

sideration, i.e. teaching, scholarship and community service.

*Harassment Charges*

24. There were four incidents involving remarks or actions toward Garvey personally which could be construed as sexual harassment by Peck. The last such incident occurred in January, 1986, more than 180 days prior to the date Garvey filed a complaint with the PHRC.

25. There was no evidence linking these incidents to subsequent events so as to show a continuing pattern of discrimination perpetrated against Garvey by either Peck or the administration.

26. None of the four incidents impaired Garvey's ability to perform her job to any appreciable degree.

27. In January, 1986, Garvey brought to the attention of the administration an incident involving Peck's alleged sexual harassment of a student. She met with Deans Allan, Nichols and Garrett and related to them what the student allegedly victimized, and other students, had told her about Peck's allegedly inappropriate conduct on several occasions in a variety of contexts, and also related what she (Garvey) had observed personally.

28. Based on this report, the college took remedial action. Dean Nichols met with Peck, told him of the reports which had been made, expressed concern, and strongly advised that he seek counseling at the college counselling center or from a private counselor of his own choosing. Dean Nichols later followed up this meeting by contacting the college counseling center to see if Peck had, in fact, contacted the center and requested counselling. She learned that he was undergoing counseling, but was told that the status and nature of that counseling could not be divulged for reasons of privacy.

29. Deans Nichols and Allan received no further reports of harassment on Peck's part (other than hearing unsubstantiated rumors), and, based on the absence of such reports or complaints, assumed that the problem had been resolved.

30. The reports and rumors circulating about Peck's conduct created a divisive, tense working situation within the drama department during the Spring 1986 semester. Students were aware of the tension between and among faculty members and were disturbed by the rumored harassment of a fellow student by Peck. The situation made students uncomfortable and deterred them from participating with enthusiasm in student productions, as they had in the past.

31. By the Fall 1986 semester, the situation was much improved, and the level of student participation had, for the most part, returned to normal. The relationship between Garvey and Peck, however, remained strained and continued to be so throughout the remainder of both of their respective terms at Dickinson. Part of the responsibility for this continuing disharmony lies with Garvey. She made no effort to overlook her personal dislike of Peck or to work harmoniously with him, and with other members of the department who did so, for the greater good of the department and the students.

32. Peck did not, however, retaliate against Garvey or prevent her from carrying out her duties effectively, as she alleged by, *inter alia,* taking teaching assignments away from her, interfering with her teaching, etc.

III. DISCUSSION

A. *Recovery under Title VII for retaliatory discharge*

■ To recover on a retaliatory discharge claim under Title VII, the plaintiff must show that: (1) she was engaged in a protected activity; (2) she was discharged after or contemporaneous with that activity; and (3) there was a causal connection between the protected activity and the loss of her job. *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 501 (3d Cir.1991), citing *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir. 1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990). Accord: *Bennun v. Rutgers, The State University,* 737 F.Supp. 1393, 1399–1400 (D.N.J.1990), reversed on other grounds, 941 F.2d 154 (3d

Cir.1991). The third element, causal connection, "'may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" *Bennun, supra,* 737 F.Supp. at 1400, citing *Burrus v. United Telephone Co. of Kansas, Inc.,* 683 F.2d 339, 343 (10th Cir.1982), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982).

■ Once a prima facie case is established, the burden shifts to the defendants to articulate a legitimate non-discriminatory reason for their failure to renew her teaching contract. If that is accomplished, the burden of persuasion then reverts to Garvey, and requires her to show that the proffered rationale is a mere pretext or fabrication masking an intent to discriminate against her on the basis of gender. The defendants' burden is only one of production; the ultimate burden of persuasion rests with the plaintiff at all times. If the defendant articulates a legitimate non-discriminatory reason for the discharge, any presumption of discrimination drops from the case. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253–

55, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981).[4]

■ A plaintiff may meet her burden directly, by persuading the court it is more likely than not that her termination was motivated by a discriminatory reason, or indirectly, by showing that the defendant's proffered explanation is unworthy of credence. *Burdine, supra,* 450 U.S. at 257, 101 S.Ct. at 1095–96 and *Williams v. Giant Eagle Markets, Inc.,* 883 F.2d 1184, 1192 (3d Cir.1989).

■ In a discrimination case based on the denial of tenure or renewed employment, the plaintiff is not required to show that she was discriminated against at every stage of the evaluation process. It is permissible for the trier of fact to find that a discriminatory animus operating at any level of the review process played a role in the assessment of plaintiff's qualifications and affected the ultimate decision. *Roebuck v. Drexel University,* 852 F.2d 715, 726–27 (3d Cir.1988).

■ Proof of discharge alone, however, does not establish a Title VII claim.

---

**4.** The United States Supreme Court recently modified the evidentiary framework of *Burdine* for a limited set of Title VII cases. In *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), a plurality of the Court created a new set of rules governing mixed-motive Title VII cases. A mixed-motive case is one in which the plaintiff proves that the adverse employment decision resulted from a mixture of legitimate business reasons and prohibited discriminatory motives. *Bowman v. Bank of Delaware,* 712 F.Supp. 1150, 1157 (D.Del.1989), citing *Price Waterhouse, supra,* 490 U.S. at 247 n. 12, 109 S.Ct. at 1789 n. 12.

In a mixed-motive case, if the plaintiff proves that a prohibited criterion (e.g. race, color, religion, sex or. national origin) was a motivating factor in an adverse employment decision, "the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the forbidden characteristic into account." *Bowman, supra,* 712 F.Supp. at 1157, citing *Price Waterhouse,* 490 U.S. at 244–45, 109 S.Ct. at 1787–88.

Mixed-motive cases are distinguishable from *Burdine*-like pretext cases in which the plaintiff attempts to show that the employer's proffered explanation for its action is false. *Price Waterhouse, supra,* 490 U.S. at 247 n. 12, 109 S.Ct. at

1789 n. 12. In pretext cases, the analysis remains the same as before *Price Waterhouse, supra.* *Hill v. Bethlehem Steel Corp.,* 729 F.Supp. 1071, 1072–73 (E.D.Pa.1989), *aff'd per curiam,* 902 F.2d 1560 (1990).

This dichotomy of standards requires the district court to make a threshold determination as to whether the case before it involved mixed motives. *Bowman, supra,* 712 F.Supp. at 1157, citing *Price Waterhouse, supra,* 490 U.S. at 247 n. 12, 109 S.Ct. at 1789 n. 12.

In the case *sub judice,* Garvey has failed to persuade the court that it is more likely than not that a discriminatory animus played a role in the college's decision not to renew her teaching contract. This is, therefore, a *Burdine* pretext case, not a *Price Waterhouse* mixed-motive case, and we will, therefore, follow the evidentiary framework laid out by the Supreme Court in *Burdine, supra.* Accordingly, Garvey may prevail only if she succeeds in demonstrating that the college's stated reasons for her non-renewal are merely pretextual. See: *Hill, supra,* 729 F.Supp. at 1073. (District court concluded that the case was not of the mixed-motive variety, because the plaintiffs "failed to prove that their age, an illegitimate reason, played a motivating part in the employment decision to discharge them. As a consequence, *Price Waterhouse* does not apply to this case.") and *Bowman, supra,* 712 F.Supp. at 1158.

Title VII does not protect employees from harsh or unfair employment actions or mistakes but only from employment actions based on unlawful considerations. *Hawkins v. Ceco Corp.*, 883 F.2d 977 (11th Cir.1989) and *Pollard v. Rea Magnet Wire Company, Inc.*, 824 F.2d 557, 560 (7th Cir. 1987), *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987) and *Charles Jacquin Et Cie*, 48 FEP Cases 795, 803, 1988 WL 111984 (E.D.Pa. Oct. 20, 1988), *aff'd sub nom., Trail v. Charles Jacquin Et Cie, Inc.*, 884 F.2d 1385 (3d Cir.1989). The implementation of and adherence to neutral rules does not constitute discrimination. *Miller v. Yellow Freight Systems, Inc.*, 758 F.Supp. 1074, 1079 (W.D.Pa.1991) (Smith, J.).

■ Nor does Title VII protection against retaliation clothe the complainant with immunity for past and present inadequacies, unsatisfactory performance, or uncivil conduct in dealing with her colleagues. *Jackson v. St. Joseph State Hospital*, 840 F.2d 1387 (8th Cir.1988) *cert. denied*, 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988). The court may look to the employee's "pre-retaliation" employment record for evidence refuting plaintiff's claim of retaliation. *Canitia v. Yellow Freight System, Inc.*, 903 F.2d 1064, 1066–67 (6th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990).

■ Additionally, when the decision at issue involves the grant or denial of tenure at an academic institution, the courts are careful not to second-guess the decision of the college administration. It is not the court's function to overturn the administration's decision because it would have reached a different conclusion or because it believes the standards applied were unduly demanding. The only issue before the court is whether the administration's stated reasons for termination are a mere pretext for discrimination. *Molthan v. Temple University*, 778 F.2d 955 (3d Cir.1985) and

*Keddie v. Pennsylvania State University*, 412 F.Supp. 1264, 1270 (M.D.Pa.1976).

■ Garvey failed to establish a *prima facie* case, because she did not show a causal link between her report of harassment by Peck and the decision approximately one year later by two separate committees and the Dean of the College not to renew her teaching contract.[5] Aside from the lack of direct evidence of a discriminatory motive, the suggestion that the persons who participated in her renewal evaluation acted with discriminatory intent defies logic. The review was conducted by no less than three sets of independent persons—the three-member Ad Hoc Committee, the five-member FPC—with input from an outside evaluator not affiliated with Dickinson in any way, and the Dean. Although the latter two received input from the others, each conducted an independent evaluation of Garvey's fitness to continue teaching at the college and each, independently, recommended non-renewal.

Garvey has offered no direct evidence of retaliation or retaliatory motive by the persons who participated in her final (1987) evaluation. To find in her favor, we would have to conclude that there is a causal connection between her report of sexual harassment to Deans Allan, Nichols and Garrett in January, 1986, and the decisions made by each of these persons/committees against renewal of her contract approximately one year later. There is not one shred of credible evidence to show that this was the case. Moreover, there is substantial evidence to show that dissatisfaction with her teaching was the real reason for her non-renewal. See, e.g., *Bowman v. Bank of Delaware*, 712 F.Supp. 1150, 1158 (D.Del.1989), ("[P]laintiff's evidence ... 'lacks the necessary mortar with which to build a case of ... discrimination'.... [His] evidence consists only of a litany of his own unsubstantiated complaints. Not one witness called by Bowman could corroborate his claims of discrimination.")

---

**5.** Garvey has met the first two prongs of the *Jalil* test, having demonstrated that she was engaged in a statutorily protected activity (the reporting of alleged incidents of sexual harassment) and that she has suffered an adverse employment action, but this accomplishment is unavailing unless she can also satisfy the third by demonstrating a causal connection between the first two. See, e.g., *Canitia, supra*, 903 F.2d at 1066.

Garvey's pre–1986 employment records show unequivocally that she had continuing difficulty meeting the standards expected of her as teacher and was criticized for this failing, in one form or another, in each and every evaluation conducted during her term at the college. Thus, even if she had established a *prima facie* case, we would, nevertheless find in defendants' favor, because they established a legitimate non-discriminatory reason for her termination. See, e.g., *Molthan v. Temple University*, 778 F.2d 955, 962 (3d Cir.1985) ("We conclude that the evidence produced by Dr. Cohen was insufficient as a matter of law to warrant any inference of discriminatory motive. The record shows no more than a denial of promotion as a result of a dispute over qualifications.... 'For a plaintiff to succeed in carrying the burden of persuasion, the evidence as a whole must show more than a denial of tenure ... in the context of disagreement about the scholarly merits of the candidate's academic work, the candidate's teaching abilities or the academic needs of the department or university.'" Footnote and citation omitted.)

The reasons articulated by Dickinson for declining to renew Garvey's teaching contract are its dissatisfaction with her teaching abilities, the students' perception of her as disorganized and ineffectual and her continued inability to interact effectively with other members of the drama department. These concerns were communicated to Garvey in evaluation/review letters written by Dean Allan at the conclusion of the 1983 and 1985 school years—before Peck was hired to chair the drama department and long before Garvey's January, 1986 report of sexual harassment by Peck.

In its 1985 review of Garvey, the FPC initially recommended that she not be retained. Dean Allan's letter indicated that there were serious problems with her teaching: She was perceived as disorganized, ineffective in leading discussion, and an uninspiring and unchallenging lecturer, and that these problems and her approach hampered her directing as well (D49). Even after approving her renewal in 1985, Dean Allan's letter (D16) still indicates that

her teaching was found to be unevenly effective for reasons only partially due to classroom deficiencies and problems beyond her control. He also advised her that her performance would have to improve by the next evaluation. Her failure to bring her teaching and directing performance up to the level expected of her resulted in her non-renewal in 1987.

These early statements of dissatisfaction with her teaching abilities reenforce our finding that Garvey's role in reporting the alleged harassment by Peck had no bearing on the decision not to renew her contract. She had been warned long before Peck's conduct became an issue that her teaching performance fell short of the standards expected of her by Dickinson, and that improvement would be required if she expected to continue her career there and ultimately secure tenure.

Another reason cited by the Committee for Garvey's dismissal was her unwillingness to cooperate with her colleagues. The administration found her to be a divisive, or at least not a conciliatory, presence within the department. It further found that she demonstrated a marked inability to cooperate productively with her colleagues. These findings were supported by, *inter alia*, the testimony of Christine Vilardo and David Brubaker. Villardo testified that Garvey was uncooperative within the department and did not enjoy a good working relationship with her drama department colleagues, even prior to Peck's arrival. Brubaker testified that he had noted a weakness in this area on Garvey's part, and stressed to her the need for improvement.

### B. *Alleged retaliation by Peck*

Garvey argues that Peck retaliated against her by, for example, excluding her from departmental decisions, arbitrarily deciding the teaching schedule, etc., and that this made her job more difficult and hampered her efforts to be an effective teacher. The record does not support this assertion. One of the ways that Garvey alleges Peck retaliated against her was by unfairly altering her teaching assignments for the 1986/87 school year. Two years earlier in

her PAS statement of September 19, 1984 (D44) Garvey stated it was her goal to teach all of the courses in the drama department before Brubaker retired. In the memo summarizing the PAS meeting of that year (D45), Dean Allan noted that Garvey taught all of the classes in the department and endorsed this generalist approach. Dean Allan's memo also documented Garvey's expectation that she and Brubaker's replacement would rotate assignments in the acting and directing courses.

The courses that Garvey taught in the Fall of 1986, (directing and theater history) are courses Garvey had taught before. She taught theater history every. year. She had previously taught directing as well. In fact, in her memo of April 27, 1985 (D51) Garvey at that time complained because Brubaker *would not* allow her to teach directing.

In the Spring of 1987 Garvey taught advanced directing and a seminar called "Art and Public Service". Garvey testified that she had always wanted to teach an advanced directing course. Garvey further claimed that she had been forced to alter her Spring 1987 teaching schedule because Peck had allowed Jim Drake to withdraw from a project planned for that semester, the Titanic Project. Testimony from other members of the department and from Garvey herself undermined this assertion. Garvey admitted that she had been aware of Drake's withdrawal months before the Spring semester began and that plans for the proposed project had never been completed or formalized. Christine Villardo testified that Garvey had not been scheduled to participate directly in the project in any event. All of this belies Garvey's assertion that Drake's last minute withdrawal from the project disrupted her Spring teaching schedule and forced her to create a new course at the last minute.

Garvey also asserts that Peck retaliated against her by not disciplining the students in the department in the fall of 1986. She claims that this resulted in her having to discipline the students herself, making her the "heavy". This assertion is a reference in the November 21, 1986 faculty minutes indicating that a memo would be issued on behalf of the entire department proscribing disruptive conduct by students.

Garvey alleges her performance suffered because of the disruption in student interest and participation caused by the Peck incident. To the extent that this situation may have detrimentally affected Garvey's performance, the effect must or certainly should have dissipated by the Fall of 1986 at the latest. By that time, student participation levels had rebounded and the situation had essentially returned to normal. A departmental memo dated November 21, 1986 notes that the department was delighted with the "high visibility of students".

Garvey further alleges that Peck intentionally and maliciously withheld money from one of her student productions, a play called *Loose Ends*, forcing her to struggle to put on the production with a grossly inadequate budget. This contention is discredited by her own testimony and by documentary evidence. Garvey admitted that Peck did not necessarily make a decision to withhold the money from her production specifically, but that the money she claims was withheld was merely a departmental surplus at the end of the year. Additionally, her claim that she had to work with a $400.00 budget is contradicted by her own writing of May 1, 1987 (D21, p. 11) in which she stated, "My budget for *Loose Ends* was a total of $1,000.00." Finally, departmental minutes reflect that construction costs for *Loose Ends* actually came in under budget.

Garvey also complains that the situation created by Peck's alleged misconduct required her to spend extra time counseling students troubled by the rumors and reports circulating on campus. Again, this inconvenience to her was of limited duration, and had ended by the Fall of 1986 at the latest.

For these reasons, we find that evidence presented is not sufficient to support a claim of retaliatory harassment by Peck.

## C. Recovery under PHRA for retaliatory discharge

 Plaintiff's claim for retaliatory discharge under the PHRA, 43 P.S. § 955(d),[6] fails for the same reasons as her claims under Title VII. Discrimination claims filed under the PHRA are considered in accordance with the analytical framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and subsequently refined in *Burdine, supra.* See: *Allegheny Housing Rehabilitation Corp. v. Pennsylvania Human Relations Commission,* 516 Pa. 124, 129, 532 A.2d 315, 318–319 (1987) (alleged racial discrimination)[7]; *General Electric Corp. v. Pennsylvania Human Relations Commission,* 469 Pa. 292, 365 A.2d 649 (1976) (plurality decision).

## D. Hostile environment claim

 Plaintiff also seeks to recover under a hostile environment theory. The Third Circuit recently reiterated the elements necessary to make out a claim of this type. The plaintiff must show that (1) employees suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. *Drinkwater v. Union Carbide Corp.,* 904 F.2d 853, 860 (3d Cir.1990), (citing *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir.1990). Garvey has not demonstrated the existence of these elements to a degree sufficient to establish a prima facie case.

Plaintiff's hostile environment claim is not supported by the evidence. Although Garvey concedes that Peck did not make any suggestive remarks to her, personally, after January, 1986, she alleges that he continued a campaign of harassment against her throughout the 1986–87 school year. She attributes this campaign to hostility generated by her role in exposing his inappropriate behavior towards her and other female staff members and students. Specifically, she alleges that Peck interfered with her courses, excluded her from the departmental decision-making process, and used divisive tactics to curry favor for himself among other members of the department and to alienate her from colleagues.

Garvey has failed to prove that the allegedly hostile environment created by Peck's reported indiscretions had an adverse affect on her employment. Further, there is evidence that, to the extent that relationships within the department were strained during the 1986–87 school year, Garvey herself contributed to this situation by refusing to make a sincere effort to work harmoniously with her colleagues and put her personal feelings aside for the good of the department.

## E. Continuing violation theory

 Defendants argue that the statute of limitations bars plaintiff from recovering for any of the four acts of harassment perpetrated against her personally because they did not occur within 180 days of the date she filed charges with the PHRC as is required by 42 U.S.C. 2000e–5(e) and 43

---

**6.** Section 5(d) of the PHRA, 43 P.S. § 955(d) provides:

It shall be an unlawful discriminatory practice ...

(d) For any person, employer ... to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act.

**7.** The Pennsylvania legislature modeled the PHRA on Title VII and the federal Rehabilita-

tion Act of 1973 Pub.L. No. 93–112, 87 Stat. 355 (codified as amended at 29 U.S.C. § 709–796i). *McWilliams v. AT & T Information Systems,* 728 F.Supp. 1186 (W.D.Pa.1990) and *Murphy v. Cartex Corp.,* 377 Pa.Super. 181, 546 A.2d 1217 (1988). The Pennsylvania Supreme Court has frequently employed federal case law in its construction of the PHRA. See, e.g., *General Electric, supra,* 469 Pa. at 303–06, 365 A.2d at 654–57.

P.S. § 959(g).[8] *Trevino–Barton v. Pittsburgh National Bank*, 919 F.2d 874, 878 (3d Cir.1990). Timely filing of an action is a pre-requisite to pursuing a Title VII claim. *United Air Lines v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

■ Plaintiff argues that the "continuing violation" theory allows her to recover for these incidents even though it is clear that she did not file an action until after expiration of the statute of limitations on those incidents.

■ This theory allows a plaintiff to pursue a Title VII claim for discriminatory conduct which began outside the limitations period if she can demonstrate that the conduct alleged is part of an on-going practice or pattern of discrimination effected by the employer. *Bronze Shields, Inc. v. New Jersey Department of Civil Service*, 667 F.2d 1074, 1080–84 (3d Cir.1981), *cert. denied*, 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384 (1982). To rely on this theory, the plaintiff must prove that a violation occurred within the limitations period and that such violation is "reasonably related" to prior discriminatory acts alleged. *Jewett v. International Telephone and Telegraph Corp.*, 653 F.2d 89, 91–93 (3d Cir.1981), *cert. denied*, 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981). Isolated or sporadic incidents of discrimination, even if intentional, are not sufficient to establish the requisite pattern. *Jewett, supra*, 653 F.2d at 91–93. She must also

show that the continuing harassment was sustained and consisted of more than incidents of a trivial nature. *Moylan v. Maries County*, 792 F.2d 746, 749–50 (8th Cir.1986). Nor is it sufficient to show only that Garvey suffered a loss within the limitations period as a result of prior discriminatory acts. *Delaware State College v. Ricks*, 449 U.S. 250, 256–57, 101 S.Ct. 498, 503–04, 66 L.Ed.2d 431 (1980).

Garvey has failed to establish facts sufficient to support her continuing violation theory. She has shown no nexus between these alleged incidents of harassment and any subsequent conduct that constituted a continuing violation. Nor has she proven a practice or pattern of harassment perpetrated against her by Peck. She has proven only the occurrence of four isolated incidents, which did not recur after January, 1986. This is not sufficient, and claims for the alleged incidents of sexual harassment perpetrated against Garvey by Peck are therefore barred as untimely.[9] See: *Moylan v. Maries County*, 792 F.2d 746 (8th Cir.1986), (A "single incident or isolated incident generally will not be sufficient." The plaintiff must show "a pattern or practice of harassment.") and *Cuffy v. Getty Refining & Marketing Co.*, 648 F.Supp. 802, 809–10 (D.Del.1986), (District court rejected application of the continuing violation theory, basing its ruling in part on the absence of any "intrinsic connection" between the events demonstrating a pattern of discrimination.) Cf. *West v. First Pennsylvania Bank, N.A.*, Civil No. 89–

---

8. "Under the statutory scheme, no charge may be filed with the EEOC in a state, such as Pennsylvania, which provides an administrative remedy for discrimination until the charge is first filed with the state agency and either (1) sixty days elapses or (2) the agency terminates its proceedings." *Trevino–Barton, supra*, 919 F.2d at 878–79, citing § 706(c) of Title VII, 78 Stat. 260, as amended in 1972, 86 Stat. 104, 42 U.S.C. § 2000e–5(c) and *Mohasco Corp. v. Silver*, 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980).

9. We have previously rejected Garvey's argument that she did not suffer harm until the college refused to renew her teaching contract, and that it was, therefore, that incident which triggered the limitations period. We rejected that argument for the reasons discussed in our prior opinion of April 11, 1991, and because it is

contrary to the United States Supreme Court's holding in *Ricks, supra*, 449 U.S. at 256–57, 101 S.Ct. at 503–04 (The Title VII limitations period began when the college announced that the professor would not receive tenure and would be granted a one year "terminal contract", not on the date of his ultimate discharge from the college upon expiration of his one year "terminal" contract.) See also: *E.E.O.C. v. Westinghouse Electric Corp.*, 725 F.2d 211, 218 (3d Cir. 1983), *cert. denied*, 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984), (Age Discrimination in Employment Act ("ADEA") case) and *Weibley v. Westinghouse Electric Corp.*, 683 F.Supp. 111, 114–15 (E.D.Pa.1988), (ADEA case). It is the violation itself, not some subsequent harm which may flow from it, that triggers the start of the limitations period. *Ricks, supra*.

4730, slip op. at 6 (E.D.Pa. July 25, 1990), (available on Westlaw at 1990 WL 106858), (Plaintiff had sufficiently shown a series of acts of racial and/or gender-based discrimination that were part of a pattern by pointing to proof that she had been excluded from a training program, denied a salary adjustment in conjunction with promotion, given low performance ratings, harassed and subjected to retaliation for complaining about these incidents.) and *Porta v. Rollins Environmental Services,* 654 F.Supp. 1275, 1281 (D.N.J.1987), *aff'd without opinion,* 845 F.2d 1014 (3d Cir.1988).

## IV. CONCLUSIONS OF LAW

Based on the applicable law and the facts before us, we reach the following conclusions of law:

1. This Court has jurisdiction over Garvey's Title VII claim (Count I), pursuant to 42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. § 1391.

2. This Court has jurisdiction over Garvey's Pennsylvania Human Relations Act claim (Count III) as a pendent claim arising out of the same set of operative facts as Count I.

3. Venue in this district is proper, since Garvey was a resident of the Middle District of Pennsylvania when the cause of action arose. She was also employed in this district, and the cause of action arose here. 42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. § 1391(c).

4. Garvey was an employee of Dickinson College within the meaning of 42 U.S.C. § 2000e(f) and 43 P.S. § 954(c).

5. Dickinson College was an employer of Garvey within the meaning of 42 U.S.C. § 2000e(b) and 43 P.S. § 954(b).

6. Garvey has satisfied all statutory prerequisites for bringing this action.

7. Garvey's charges with the PHRC were filed within 180 days of notification that her teaching contract would not be renewed.

8. Garvey commenced this action within 90 days of issuance of the "right to sue letter".

9. Dickinson did not discriminate against Garvey in retaliation for reporting alleged incidents of sexual harassment by Peck.

10. Garvey has not made out a *prima facie* case of discrimination, because she has not established a causal connection between her discharge and her reporting alleged sexual harassment by Peck to the administration. There are no proven facts which establish a causal connection between the two.

11. Additionally, the college has established legitimate non-discriminatory reasons for her discharge: her inadequate performance as a teacher and a director and her inability to work as a "team player", and that these reasons were the sole motivation for her discharge.

12. Garvey cannot recover for any of the four alleged incidents of harassment perpetrated by Peck against her personally because the statue of limitations on those claims expired before she filed a complaint, and because, contrary to her contention, the continuing violation theory does not apply.

13. Garvey has not established a sufficient link between the incidents to prove a continuing violation.

14. Plaintiff has not established the necessary elements for a hostile environment claim.

15. The hostile environment claim is barred by the statute of limitations.

16. Defendants are entitled to recover filing costs.