Martin WASHINGTON, Plaintiff,

v.

**COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY, Defendant.**

Civ. A. No. 92–3637.

United States District Court, E.D. Pennsylvania.

March 10, 1994.

Alan B. Epstein, Jablon, Epstein, Wolf & Drucker, Philadelphia, PA, for plaintiff.

A. Taylor Williams, Maryellen Gallagher, Administrative Office of Pennsylvania Courts, Willan F. Joseph, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for defendant.

*MEMORANDUM*

ROBERT F. KELLY, District Judge.

In December 1990, the Supreme Court of Pennsylvania ordered the Court of Common Pleas for Philadelphia County to make a "reduction in force" in order to become "fiscally responsible." After a highly-publicized disagreement, the Court of Common Pleas reluctantly decided to comply with the Supreme Court's mandate to reduce its budget and laid off approximately 250 court employees. The lay-offs were the first in the history of the Philadelphia court system.

Among those laid off was Martin Washington, ("Washington") who filed this case on June 22, 1992. Washington, who is a black male, claimed that his lay-off was motivated by racial discrimination, or was in retaliation for a complaint Washington had filed with the Pennsylvania Human Relations Commission ("PHRC") nine months prior to his dismissal.

Washington's complaint contained nine counts. The first four counts were racial discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Pennsylvania Human Relations Act, 43 Pa.S.A. § 955(a) and (b).[1]

The case proceeded to a jury trial which began on November 1, 1993. One week later, the jury returned a verdict in favor of Washington on his retaliation claim, and awarded him $25,000 in damages. The jury decided against Washington on his racial discrimination claim. Washington filed a posttrial motion requesting that the judgment in his favor be amended to reflect nearly $90,-000 in damages instead, a figure based on Washington's lost wages from the time of his lay-off, and also requested an order reinstating him to his position with the Court of Common Pleas, with appropriate salary and benefits. The Court of Common Pleas responded with a motion for judgment as a matter of law, requesting that the court overturn Washington's verdict on the retaliation claim.

## I. *THE TESTIMONY AT TRIAL*

Washington began working with the Philadelphia Municipal Court in 1971, as a clerk. He received a number of promotions through the ranks and eventually became a deputy court administrator, one of two in the municipal court system at that time. N.T. November 2, 1993 at 101–02. In 1986, Washington left the Municipal Court to take a job as director of court operations for the Connecticut Superior Courts. N.T. November 2, 1993 at 104.

Washington left the position in Connecticut in December 1987 and returned to Philadelphia. He was unsuccessful in attempting to be re-hired by the Municipal Court. N.T. November 2, 1993 at 134–35. After being unemployed for nearly seven months, he was hired by the Court of Common Pleas in June 1988 as a senior supervisor in charge of the Records and Notification Unit of the Pre-Trial Services Division. Uncontested facts ¶ 3–5.

When he began work with the Court of Common Pleas in 1988, Washington was given the classification of Court Administrator III and his supervisor was Robert Johnson, a black male. Uncontested fact ¶ 6. In Sep-

---

**1.** On June 8, 1993, I granted summary judgment in favor of Court of Common Pleas on five other counts, which I will briefly review.

Count V alleged a violation of the Civil Rights Act, 42 U.S.C. § 1983. The Philadelphia Court of Common Pleas is not a "person" for the purposes of § 1983. *Will v. Michigan Department of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

Count VI was brought under § 1981 of the Civil Rights Act, and alleged that Washington was discriminated against in derogation of his right to make and enforce contracts. Termination and failure to promote claims are not cognizable under § 1981. *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

Count VII claimed that the Court of Common Pleas had violated the Constitution of the Commonwealth of Pennsylvania and the "public policy" of Pennsylvania. Count VIII alleged that the Court of Common Pleas had "specific intent to harm" Washington, and Count IX asserted a breach of contract claim. Washington's wrongful discharge claims were encompassed in his claims brought under the Pennsylvania Human Relations Act. He had no discernible cause of action under the Constitution of Pennsylvania, and in any event, Pennsylvania's adherence to the "at-will" standard in employment discharge cases made summary judgment appropriate on all three of these counts.

tember 1989, Washington was given a promotion to a Court Administrator IV. In April 1990, Robert Johnson announced he would be retiring as director of Pre–Trial services, and court employees were invited to apply for his position. Washington wrote to court management expressing his interest, but the position of director was given to Nathaniel Johnson, ("Johnson") a black male. Joseph DiGuglielmo, a white male, was appointed to the newly-created position of deputy director. N.T. November 2, 1993 at 113; N.T. November 3, 1993 at 19.

Washington began reporting to DiGuglielmo, who was critical of his work performance. Some of DiGuglielmo's criticism of Washington's work was verbal, but DiGuglielmo also sent Washington written memos, copies of which were sent to Johnson. DiGuglielmo told Washington in writing that he had not completed several assigned tasks on time, or at all. Among these were assignments to dispose of old files; to clean out the "burn room"; to prepare a memo establishing a plan to "rotate" entry-level employees from one department to another; and to set up a training class for newly-hired investigators. N.T. November 3, 1993 at 75–85. DiGuglielmo also criticized Washington for failing to comply with the policy on sick leave. N.T. November 3, 1993 at 85.

Washington responded to these criticisms with a lengthy memo to DiGuglielmo, copied to Johnson, dated October 18, 1989, complaining that DiGuglielmo's "actions depict covert racist overtones." Defendant's Exhibit 14–B; N.T. November 3, 1993 at 113–14. At trial, asked to describe the nature of DiGuglielmo's actions, Washington said that there was "ongoing harassment, deliberate attempts to destroy my character, constantly scrutinized about my work, basically being on my case every day about whatever he felt like being on, attacking me, accusing, making accusations about me." N.T. November 2, 1993 at 114.

Washington's memo stated, in part, "Please be advised that this written response is to inform you of the issues, concerns and ramifications generated by your written memos' (sic) to date in-concert with the long-

standing harassment that has been directed towards me both verbally and in writing ... My rights both Equal and Civil and the rights of my family *shall* always be protected ... I am advising you of my intent to explore all legal means and resources available to me in-order to seek redress and relief." (emphasis in original) Defendant's Exhibit 14–B; N.T. November 2, 1993 at 55–59.

The following day, October 19, 1990, Washington filed a complaint with the PHRC and the Equal Employment Opportunities Commission ("EEOC") alleging that he had been "discriminated against because of his race and age by harassing with disciplinary memos with an intent to destroy [my] professional career." Stipulated Amendments to Pretrial Order at ¶ 1.

On October 30, 1990 Washington received an evaluation, made by DiGuglielmo and approved by Johnson which rated his overall performance as "satisfactory." Washington's evaluation had been delayed because Johnson and DiGuglielmo requested more time after their appointments to assess Washington's performance. Affidavit of DiGuglielmo at ¶ 10. After Washington filed his charge, DiGuglielmo consulted the City Solicitor's Office, and was advised to proceed with Washington's evaluation. Affidavit of DiGuglielmo at ¶ 14. Comments provided by DiGuglielmo at the bottom of the evaluation sheet described Washington's performance as "marginally satisfactory." Washington was told, among other things, that he was "lethargic" and "insular" and he should improve his ability to complete assignments as directed. Exhibit D–34.

On December 9, 1990 Washington was informed by Johnson that he was being transferred to Training and Forms Coordinator. There was no loss of pay or classification. N.T. November 2, 1993 at 49–50. Edward Burnley, a black male, assumed Washington's duties as supervisor of the Records and Notification Unit. Uncontested facts ¶ 20–21. A fact-finding conference on Washington's PHRC claim was held on December 12, 1990. Uncontested Fact ¶ 18.[2]

---

2. The PHRC processed the claim and ultimately determined there was no probable cause for

Washington's charges and dismissed the claim.

On December 19, 1990, the Supreme Court of Pennsylvania entered its order directing the Court of Common Pleas to reduce its budget and staffing. Uncontested fact ¶ 24; N.T. November 4, 1993 at 68–69. In response, Judge Nelson A. Diaz, Administrative Judge of the Trial Division, appointed a three-judge staffing committee on January 19, 1991, whose mission was "to review staffing requirements ... in order to effect fiscal economies within our Court." Exhibit P–13. The staffing committee, composed of Judge Russell M. Nigro, Judge Fredericka A. Massiah–Jackson, and Judge Michael R. Stiles, reviewed organizational reports and met with department heads, including Johnson, before issuing a report on March 11, 1991. The staffing committee's report recommended laying off 10% of the employees in each department. N.T. November 4, 1993 at 75.

The staffing committee's report had the effect of telling Johnson that nine positions, including at least four supervisors, had to be laid off in Pre–Trial Services. At the time of the Supreme Court mandate, Pre–Trial Services had 82 employees. Plaintiff's Exhibit 13; N.T. November 4, 1993 at 4–5, 36, 75. The criteria to be used in making lay-off decisions included seniority, work performance, performance ratings, sickness, lateness, salary and reprimands. N.T. November 4, 1993 at 4. Johnson reviewed staff matters with DiGuglielmo and submitted the names of nine employees to be laid-off, which were 4 black males and 5 white males. N.T. November 4, 1993 at 4. Washington's name was the second name on the list. Plaintiff's Exhibit 19; N.T. November 3, 1993 at 102–03.

The final decision on whose names would be submitted for lay-offs in Pre–Trial Services was made by Johnson alone. N.T. November 4, 1993 at 34. However, Johnson stated at trial that Washington would not have been laid off but for the reduction in force mandate. N.T. November 4, 1993 at 34. No one had advance knowledge of who were to be laid-off. Johnson typed the memo naming those to be laid-off personally on a Sunday and delivered it himself so no one would know in advance. N.T. November 4, 1993 at 29–30.

Washington testified that late in May 1990, while he was passing DiGuglielmo in a hallway, DiGuglielmo muttered "Only the fittest survive, jungle bunnies don't." N.T. November 2, 1993 at 120–22. Two days later, Johnson called Washington into his office and informed Washington that his position was being eliminated. Washington received a letter from Judge Diaz informing him of his termination on May 22, 1991, which stated that he would be laid off on June 28, 1991. N.T. November 2, 1993 at 122; Plaintiff's Exhibit 22. Washington's duties were absorbed by co-worker William McGettigan, a white male. Affidavit of DiGuglielmo at ¶ 24; N.T. November 3, 1993 at 101.

## II. THE "MIXED MOTIVE" RULING

After all the evidence had been presented, I determined that this was a "mixed motive" case, over defendant's objections. A mixed motive case, as described by the Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), is one in which the plaintiff shows that the adverse employment decision resulted from a mixture of legitimate business reasons and prohibited discriminatory purposes.

■ If a plaintiff makes out a *prima facie* case by showing that a prohibited criterion was a motivating factor in the employment decision, a defendant may avoid liability by showing, by a preponderance of the evidence, that it would have made the same decision even if it had not taken the forbidden characteristic into account. *Griffiths v. Cigna Corporation*, 988 F.2d 457, 469 (3d Cir.1993); *see e.g., Garvey v. Dickinson College*, 775 F.Supp. 788, 796, fn. 4 (M.D.Pa.1991).

■ It would be a fair summary of the evidence to say that DiGuglielmo's alleged racist remark was the only evidence of any discriminatory "animus" towards Washington. Although I did not think that Washington had proven that any discriminatory motive existed, prior to charging the jury I was obligated to make a "threshold" decision as to whether this was a "pretext" or a "mixed motive" case. It appeared obvious that if the jury, as the finders of fact, believed that

DiGuglielmo made the racially-offensive remark attributed to him by Washington, and also believed that DiGuglielmo was a part of the decision-making process, it was conceivable that the jury could find that racism was a motivating factor in the decision to fire Washington, along with what was clearly a legitimate reason, the mandated lay-offs.

The jury's verdict was against Washington on his racial discrimination claim, something they were unlikely to do had they believed that DiGuglielmo made the statement.[3]

### III. THE MOTION FOR JUDGMENT AS A MATTER OF LAW ON THE RETALIATION CLAIM

■ In order to make out a claim for retaliation, a plaintiff must show they were engaged in a protected activity, that they were discharged after or contemporaneously with the protected activity, and that a causal link exists between the protected activity and the loss of the job. *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 501 (3d Cir.1991). The Court of Common Pleas argues that Washington has not established a sufficient causal link between his filing a PHRC complaint and his lay-off. I agree.

■ In *Jalil v. Avdel Corporation,* 873 F.2d 701, 708 (3d Cir.1989), the Court of Appeals stated that the "causal connection required to establish a prima facie case of retaliation may be demonstrated by evidence of retaliatory motive such as protected conduct followed closely by adverse action." In *Jalil,* a causal link existed because plaintiff was fired two days after filing a complaint. In this case, Washington's lay-off came nine months after the filing of his complaint.

During the nine months that followed his complaint, there was no "pattern of antagonism" as there was in *Robinson v. SEPTA,* 982 F.2d 892 (3d Cir.1993). The record shows that following the filing of his complaint, Washington received what was by all accounts a critical evaluation, but neverthe-

less one that rated his performance as "satisfactory." Shortly thereafter, he was transferred to another section of Pre–Trial Services, a move which reduced the number of employees he supervised but had no effect on his salary or his classification. Both the evaluation and the transfer occurred over six months before Washington was eventually laid-off.

It was undisputed at trial that despite his supervisors' dissatisfaction with his work, Washington would not have been fired were it not for the Supreme Court's mandate. His lay-off came at a time when 250 other court employees were laid-off, an unprecedented event in the history of the Philadelphia court system.

Even if there were an intent to retaliate against Washington after he filed his complaint, I find that the evidence was overwhelming that the Court of Common Pleas would have made the same decision had their not been a retaliatory intent. The Supreme Court mandate which forced the Court of Common Pleas to institute mass lay-offs, considered along with the well-documented dissatisfaction with Washington's performance, his relatively high salary, and the relative ease with which Washington's responsibilities were absorbed by others, made such a decision almost unavoidable. This finding, and the nine months which elapsed after the filing of Washington's complaint and his lay-off forces me to find that the jury's verdict in favor of Washington on his retaliation claim cannot stand as a matter of law. Therefore, I will grant the Court of Common Pleas' motion for judgment as a matter of law.

Accordingly, in that I have found that the judgment in favor of Washington cannot stand, I will deny plaintiff's motion to amend the judgment and enter the following order:

### ORDER

AND NOW, this 10th day of March, 1994, upon consideration of Plaintiff's Motion to

---

3. DiGuglielmo denied making the remark. The jury also heard the testimony of a co-worker of Washington's, Mitchell Melton, who stated he was present when DiGuglielmo made the remark and agreed with Washington that DiGuglielmo had said it. Both Washington and Melton testi-

fied that neither responded to DiGuglielmo's remark, or reported it to anyone, including Johnson. Melton, a black male, was included among the supervisors Johnson recommended be laid-off, although Melton obtained a position in another court department.

Amend Judgment, Defendant's Motion for Judgment as a Matter of Law, and all responses thereto, it is ORDERED that:

1. Plaintiff's Motion to Amend Judgment is DENIED; and

2. Defendant's Motion for Judgment as a Matter of Law is GRANTED.